**Rafael GALLARDO, Jr., a/k/a "Rafa," Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–06–00057–CR.**

Court of Appeals of Texas, San Antonio.

July 25, 2007.

464

Fausto Sosa, Law Office of Fausto Sosa, Laredo, for appellant.

Jose M. Rubio, Jr., Webb County Dist. Atty., Laredo, for appellee.

Sitting: CATHERINE STONE, Justice, KAREN ANGELINI, Justice, STEVEN C. HILBIG, Justice.

## OPINION

Opinion by STEVEN C. HILBIG, Justice.

On January 15, 2005, Webb County Sheriff's Department deputies discovered the burned and bullet-riddled bodies of Roberto Patino and Enrique "Kike" Botello in the trunk of a car in colonia Pueblo Nuevo, east of Laredo. The State charged Rafael Gallardo, Jr., a/k/a "Rafa," and six others with two counts of murder, two counts of aggravated kidnapping, and two counts of engaging in organized criminal activity. The State sought to prove the defendants, alleged members of the Mexican Mafia gang, kidnapped and murdered Patino and Botello in retaliation for stealing money owed to Gallardo. The charges against Gallardo were severed and he was tried separately. The jury found Gallardo guilty on all counts and he was sentenced to two life and four ninety-nine year sentences.

Gallardo appeals arguing the evidence is legally insufficient because the convictions are based entirely on the uncorroborated testimony of two accomplice witnesses. Alternatively, Gallardo argues the evidence is legally and factually insufficient to support the convictions even if the two witnesses' testimony is considered. We disagree and affirm the judgment.

### EVIDENCE AT TRIAL

*Testimony of law enforcement officers*

The Webb County Sheriff's Department received a call a little after 8:00 p.m. on January 15, 2005, that a car was on fire in the Pueblo Nuevo subdivision. Sergeant David Flores of the Webb County Sheriff's Department was the lead investigator on the case and Texas Ranger Robert Hunter assisted him. Flores and Hunter testified that after the Laredo Fire Department doused the fire, officers discovered two burned bodies in the trunk of a four-door General Motors car. Fragments of material found on the bodies made it appear the victims had been bound and blindfolded. Officers discovered two bullet holes in the trunk and located some .40 caliber shell casings and bullet fragments around and under the car. Flores and Hunter testified the combination of the heat of the fire and the water used to put it out destroyed any potential fingerprint or DNA evidence. No weapon was ever recovered.

The ensuing investigation by the Webb County Sheriff's Department and the Texas Rangers established the victims had been kidnapped at a "crack house" at 4001 Chickasaw Lane in Laredo, where Javier "Cuate" Vera, Eliza Morales, Jose Angel "Joey" Alegria, and Michael "Shorty" Alegria lived.[1] The victims were driven to Colonia Pueblo Nuevo in the trunk of a car and shot multiple times while still in the trunk. The car was then set on fire. Sergeant Flores eventually identified seven suspects, all of whom were later indicted: Fausto Reyes, Jaime Tomas "El Pelon" Hernandez Rocha, Rogelio "El Canoso" Pena, Jr., Reynaldo Roberto "El Peine" Esparza, Michael Alegria, Joey Alegria, and Rafael "Rafa" Gallardo, Jr.

### Autopsy findings

Dr. Randy Frost, the Bexar County Deputy Chief Medical Examiner, testified autopsies were performed on the bodies in Bexar County. Dr. Frost stated the victims, identified as Robert Patino and Enrique Botello, each died of multiple gunshot wounds. The bodies were extensively burned and contained fragments of material that appeared to be shoelaces and socks. The location of the material was consistent with the victims having been bound and gagged. Toxicology tests on Patino revealed the presence of the metabolized products of cocaine; the tests done on Botello revealed the presence of cocaine, its metabolized products, and morphine.

### Testimony of Sandra Patino

Sandra Patino is the mother of Robert Patino. She testified that on the afternoon of January 15, 2005, she gave her son a ride from Cotulla to Laredo, and he asked her to stop by Joey Alegria's house where Patino had been living for two months. Patino told her to wait for him outside, but he never came back out of the house. Instead, Joey Alegria came out and told her to leave, that he would take Patino where he needed to go.

### Testimony of Eliza Morales

Eliza Morales testified that in January 2005, she and her husband, "Cuate" Vera, ran a crack house at 4001 Chickasaw Lane. They paid a monthly fee, or "cuota," to the Mexican Mafia. They usually gave the "cuota" to "El Pelon" (Rocha), but different people were sometimes sent to collect. Morales testified that both her husband and her son Michael were members of the Mexican Mafia.

On January 10, 2005, Botello, Patino, and two other men came to Morales's house where they demanded money and "disciplined" Morales's son Michael by beating him. Morales thought the men were collecting the "cuota" and she gave them $1,500.00. Five days later, on the afternoon of January 15th, Gallardo, Rocha, Reyes, Pena, and Esparza came to Morales's house. The men, all Mexican Mafia members, wanted to know why she had paid Botello and Patino. Morales testified Gallardo was angry because she had been charged by the other men and Gallardo told her he was going to show her his "protection"—"to make sure nobody hurt me or harmed me, me and my husband."

Patino arrived at Morales's house on January 15th at around 5:00 or 6:00 p.m. At Gallardo's and Rocha's directions, Reyes grabbed Patino as soon as he walked in the door. Morales testified Gallardo and Rocha were telling all the others what to do. Gallardo left the house after

---

1. Hereafter, we refer to Jose Angel Alegria as "Joey" or "Joey Alegria" and to his brother, Michael Alegria, as "Michael."

Patino arrived. Before leaving, Gallardo told Morales he was leaving Reyes there to show her his "protection." He told her to go to her room and "that whatever goes on for [her] not to say anything." Reyes, Pena, and Esparza stayed at the house.

Morales testified Botello arrived at the house about an hour later with her son Michael. Morales stayed in her room for two or three hours. During that time, she left the room once to go to the kitchen for a glass of water. Morales saw Reyes and Pena in the kitchen and saw Patino and Botello there on the floor with socks in their mouths and apparently bound at their hands and feet. Morales testified she did not know what was going to happen to them; she thought they were just going to be "disciplined"—beaten up—as Michael had been.

### Testimony of Joey Alegria

Joey Alegria testified for the State.[2] At the time of the murders he was twenty-one years old and lived at 4001 Chickasaw Lane with his mother, Eliza Morales, his stepfather, "Cuate" Vera, and his brother, Michael Alegria. Joey testified his stepfather is a member of the Mexican Mafia, and was involved in "illegal activity." To "keep doing what they do," Vera paid a monthly "cuota" or a fee to the organization. The fee was paid to Gallardo. In early January 2005, Botello, Patino, and two other men went to the house where they beat up Michael and stole the money Vera was supposed to give Gallardo.[3] Gal-

lardo found out what happened and said "he was going to do something about it."

Joey testified that on January 15th, Gallardo came to the house with a group of Mexican Mafia members to find out why he had not received the "cuota." Gallardo wanted everyone in the house assembled in front of him and asked the group what had happened to the money. Vera told Gallardo that four men had beaten up Michael and taken the money Vera was supposed to pay Gallardo. Vera said he thought the men were Gallardo's people who had come to collect for him. Gallardo became enraged and said he wanted his money. Then Gallardo told them he was leaving, but he would leave Reyes, Pena, and Esparza at the house to wait for Patino to return.[4] Gallardo told the men to call him when Patino arrived. At some point, Joey Alegria called Patino and told him to come to the house because some people needed to talk to him.[5]

Patino's mother dropped him off at the residence around 5:00 or 6:00 p.m. As soon as Patino walked in the door, Reyes put a gun to the back of his head and told him to lie down on the ground. Patino's hands were tied behind his back with a shoelace. Patino's mother was waiting for him in the car, and Joey went to talk to her at least twice before she finally left.

Reyes called Gallardo and told him Patino was at the house. Joey Alegria testified he thought Patino and Botello were just going to be "disciplined," or beaten up, because that is what happens to a gang member when he "messes up." Joey

2. Joey Alegria was indicted for the same offenses with which Gallardo was charged; Alegria is therefore an accomplice as a matter of law. *See East v. State,* 702 S.W.2d 606, 616 (Tex.Crim.App.1985), *cert. denied,* 474 U.S. 1000, 106 S.Ct. 418, 88 L.Ed.2d 368 (1985).

3. Joey testified that Botello, Patino, and Michael are also members of the Mexican Mafia,

but that neither he nor his mother, Eliza Morales, belong to the gang.

4. Gallardo knew Patino was residing at the house.

5. It is unclear from the record whether this occurred while Gallardo was still at the house or after he left.

asked Reyes "why didn't he just get it over with" and "beat [Patino] up" "so he could leave with his mom." Reyes responded "[N]o. That 'Rafa' [Gallardo] needed to talk to him and that they were going to be taken."

Botello had been out that day with Joey's brother, Michael. Joey testified Michael had driven by the house earlier when Gallardo was present, but did not stop because of all the cars parked outside. He stopped when he drove by later and saw only Reyes's car. As soon as Michael and Botello walked in, they were both "taken down." Reyes recognized Michael as Joey Alegria's brother and said "just Kike [Botello]." Patino and Botello were placed face down on the floor in the kitchen with their hands tied behind their backs. At some point, one of the men— Joey testified he believes it was Pena— called Gallardo. A car showed up at the house after sundown and backed into the driveway. Pena and Esparza carried Botello outside and put him in the trunk of the car. Reyes told Joey to help carry Patino, and when he refused, Reyes exhibited his gun and told him again. Joey and Michael carried Patino outside where he was also put in the trunk. Then Pena got in the car with someone else and left. Joey Alegria testified that based on his observations of what happened at the house, Gallardo's orders were followed.

Joey Alegria was charged as a co-defendant in the case. He testified he entered into a plea bargain and pleaded guilty to two counts of aggravated kidnapping. He was sentenced to five years in prison and agreed to testify. The State dismissed the four other counts against him and also dismissed an unrelated fraud case.

### Testimony of Reynaldo Roberto "El Peine" Esparza

Co-defendant Reynaldo "El Peine" Esparza testified for the defense. Esparza had already been tried and convicted and was serving six ninety-nine year sentences. Esparza testified he went to Joey Alegria's house alone on January 15th to buy drugs. He and Joey smoked some crack, then Patino arrived and the three of them talked and smoked more crack. After a while, Esparza left the room and he started "freaking out;" that is, having a panic attack caused by the drugs. He heard Joey and Patino talking and started thinking they were plotting to hurt him. Esparza testified he grabbed a screwdriver, put Patino on the floor, and told him not to move or he would kill him. Then he and Joey tied Patino up and smoked more crack. When Michael and Botello arrived at the house later, Esparza "freaked out" again, so he and Joey tied up Botello. Then Joey, Michael, and Esparza smoked more crack.

Esparza testified Patino and Botello "started running their mouths," threatening Esparza, while the two were bound on the floor. Because of their threats, Esparza decided to finish what he had started. Esparza took a gun from Joey and took the keys to the car from Michael. After drinking some beer and taking some "downers," he put a bicycle in the back seat of the car and had Joey help him put Patino and Botello in the trunk. Esparza testified he told Joey and Michael he was just going to beat them up, but as he was driving he got worried that Patino and Botello would come after him. He drove to Pueblo Nuevo, parked, and opened the trunk. Patino and Botello started threatening him, so he shot them. Then he poured gasoline on the car, lit it, and rode off on the bicycle. Esparza testified he did not see or talk to Gallardo during any of these events and, in fact, he did not even meet Gallardo until he was arrested on these charges.

During cross-examination, Esparza testified he is a member of the Mexican Mafia. The statement Esparza gave to the police was also admitted during cross-examination. In the signed statement, Esparza stated he went to the house on Chickasaw Lane on January 15, 2005 with Fausto Reyes, who had a semiautomatic gun. When Patino arrived at the house, Esparza, following Reyes's instructions, had Patino get on the floor and put his hands behind his back. After Botello arrived at the house, Esparza saw Reyes on the Nextel radio phone. According to Esparza's statement, Reyes then told Esparza to get a ride home because "they" were going to leave to do something. Esparza testified at trial that when he gave the statement to police he was high, had not slept in about eight days, and had no recollection of what he told the officers.

### ACCOMPLICE WITNESS

The trial court instructed the jury that Joey Alegria was an accomplice witness as a matter of law and allowed the jury to determine whether Eliza Morales was an accomplice witness. The court properly instructed the jury that it could not use accomplice testimony to convict Gallardo unless it found other evidence tending to connect Gallardo with the offenses. *See* TEX.CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005). Gallardo contends both Eliza Morales and Joey Alegria were accomplice witnesses and, because no other evidence tends to connect him to the commission of the offenses, there is legally insufficient evidence to support his convictions.

A person is an accomplice if he participates with a defendant in the commission of a crime by doing some affirmative act, with the requisite culpable mental state, that promotes the commission of that offense. *Cocke v. State*, 201 S.W.3d 744, 748 (Tex.Crim.App.2006), *cert. denied,*

549 U.S. 1287, 127 S.Ct. 1832, 167 L.Ed.2d 332 (2007) (citing *Paredes v. State*, 129 S.W.3d 530, 536 (Tex.Crim.App.2004)). "There must exist evidence sufficient to connect the alleged accomplice to the criminal offense as a 'blameworthy participant.'" *Cocke*, 201 S.W.3d at 748. For the evidence to raise a witness's culpability as a party, it must show the witness acted "with intent to promote or assist the commission of the offense" with which the defendant is charged. TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 2003). This requires a showing that the witness "harbored the specific intent to promote or assist the commission of the offense." *Pesina v. State*, 949 S.W.2d 374, 382 (Tex. App.-San Antonio 1997, no pet.); *see* TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2003) ("A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result."); *Meeks v. State*, 135 S.W.3d 104, 110–11 (Tex.App.-Texarkana 2004, pet. ref'd) (holding witness was not accomplice to capital murder because there was no evidence witness had the conscious desire to aid in the murder or the lesser-included robbery of victim).

A witness's mere presence at a crime scene does not make him an accomplice. *Cocke*, 201 S.W.3d at 748. Nor does having knowledge of the offense and failing to disclose it or concealing it. *Druery v. State*, 225 S.W.3d 491, 497 (Tex. Crim.App., 2007). "And complicity with an accused in the commission of another offense apart from the charged offense does not make that witness's testimony that of an accomplice witness." *Id.* "In short, if the witness cannot be prosecuted for the offense with which the defendant is charged, or a lesser-included offense of

that charge, the witness is not an accomplice witness." *Id.*

When a witness has been charged "with the same offense as the defendant or a lesser-included offense or when the evidence clearly shows that the witness could have been so charged," the trial judge has a duty to instruct the jury that a witness is an accomplice witness as a matter of law. *Id.* at 498. When "there is some evidence of an affirmative act on the part of the witness to assist in the commission of the charged [or a lesser-included] offense," but the evidence "is conflicting and it remains unclear whether the witness is an accomplice, the trial judge should allow the jury to decide whether the inculpatory witness is an accomplice witness as a matter of fact under instructions defining the term 'accomplice.'" *Id.*

Gallardo did not ask the trial court to instruct the jury that Morales was an accomplice as a matter of law, and he does not argue on appeal that such an instruction should have been given. Nevertheless, he argues the evidence establishes Morales was an accomplice. He contends Morales was an accomplice because "she was overtly doing business with the gang alleged in the indictment and ... her common-law husband and one of her sons were also members of the same gang," she paid the gang for "protection,"[6] the kidnapping and gang activity alleged in the indictment was part of the "protection" for which Morales paid, the kidnappings occurred at her house and in her presence or her close proximity, she was present when the victims were abducted, she turned a blind eye to what was happening, and she failed to report the crime to law enforcement.

That Morales may have been complicit with Gallardo in other crimes, such as selling drugs, does not make her an accomplice to aggravated kidnapping or murder. *See Druery,* 225 S.W.3d at 497; *Gamez v. State,* 737 S.W.2d 315, 322 (Tex.Crim.App. 1987). Nor did Morales's presence at the scene of the kidnappings or her purported knowledge of a planned offense and failure to disclose it render her an accomplice. *See Druery,* 225 S.W.3d at 498. There is no evidence Morales initiated the contact with Gallardo. Nor is there evidence Morales intended the murder victims be harmed when she explained to Gallardo why he had not been paid. At best, the evidence demonstrated Morales suspected the victims might be beaten, but the evidence also clearly shows her statements to Gallardo were in response to his demand for money and information and were intended to deflect harm from herself for her failure to pay Gallardo his "cuota."

Because Morales was not charged and the evidence did not clearly show she could have been indicted for the same offenses, she was not an accomplice as a matter of law. *Id.,* at 498; *Cocke,* 201 S.W.3d at 747–48. Because there was some evidence Morales may have committed an act that promoted the commission of one of the offenses, the trial court properly instructed the jury to decide whether Morales was an accomplice witness. However, a reasonable jury could have found Morales did not participate in, solicit, encourage, direct, or aid in the commission of the offenses, or did not do so with the required intent. *See Solomon v. State,* 49 S.W.3d 356, 362 (Tex.Crim.App.2001) (holding that where instruction on accomplice as a matter of fact is raised by the evidence, jury is free to believe witness was not in fact an accomplice); *Arney v.*

---

**6.** A fair reading of the evidence is that Morales paid Gallardo so she could continue doing business and to prevent the Mexican Mafia from harming her and her family.

*State,* 580 S.W.2d 836, 839 (Tex.Crim.App. [Panel Op.] 1979) (where witness was not accomplice as a matter of law and accomplice as a matter of fact instruction was given, court reviews whether jury's conclusion that witness was not accomplice was reasonable), *abrogated in part on other grounds by Giesberg v. State,* 984 S.W.2d 245 (Tex.Crim.App.1998); *Yost v. State,* 222 S.W.3d 865, 873–74 (Tex.App.-Houston [14th Dist.] 2007, no pet. h.)(holding reasonable jury could have found witness did not participate in offense or did not do so with required intent). Accordingly, the jury was free to consider Morales's testimony in deciding whether sufficient non-accomplice corroborating evidence was introduced at trial.

### Accomplice Witness Corroboration

Gallardo next argues the jury could not consider Joey Alegria's testimony in determining guilt because there was insufficient corroborating evidence. We again disagree.

 "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed." Tex.Code Crim. Proc. Ann. art. 38.14. To determine whether there is sufficient corroborating evidence, we eliminate the accomplice testimony from consideration and then examine the rest of the record to see if there is evidence that tends to connect the defendant with the commission of the crime. *Solomon,* 49 S.W.3d at 361. "[T]he corroboration is not sufficient if it merely shows the commission of the offense." Tex.Code Crim. Proc. Ann. art. 38.14. However, "[i]t is not necessary that the corroborating evidence directly connect the defendant to the crime or that it be sufficient by itself to establish guilt." *Cathey v. State,* 992 S.W.2d 460, 462 (Tex.Crim.App.2006), *cert. denied,* 528

U.S. 1082, 120 S.Ct. 805, 145 L.Ed.2d 678 (2000). "There must simply be *some* non-accomplice evidence which *tends* to connect appellant to the commission of the offense alleged in the indictment." *Castillo v. State,* 221 S.W.3d 689, 691 (Tex.Crim. App.2007).

 Here, the non-accomplice evidence is more than sufficient to meet the corroboration requirement. Morales testified Gallardo and the men who came to her house with him were all members of the Mexican Mafia, a criminal organization. She testified Gallardo was angry because Patino and Botello had taken money owed to him and that Gallardo told her he was going to show her his "protection." She testified Gallardo and Rocha were telling the others what to do and directed Reyes to grab Patino when he entered the door. According to Morales, Gallardo was present when Patino was grabbed and tied up. And before Gallardo left the house, he told Morales he was leaving Reyes there to show her his protection and "that whatever goes on for [her] not to say anything." Morales later saw Reyes in the kitchen where both Patino and Botello were on the floor with their hands tied behind their backs and socks in their mouths. The State's other non-accomplice evidence established that within a few hours of Patino's and Botello's arrival at Morales's house, they were found shot to death, bound with shoelaces and gagged with socks, in the trunk of a burning car. This evidence unquestionably is "some evidence" that tends to connect Gallardo to the aggravated kidnapping of Patino and the associated organized criminal activity offense. The evidence that Gallardo was directing the actions of the other men at the house and told Morales he was leaving Reyes there to show her his protection is some evidence that tends to connect Gallardo as a party to the subsequent kidnap-

ping of Botello and murder of both men. Accordingly, we hold the State presented sufficient non-accomplice corroborating evidence to support accomplice Joey Alegria's testimony.

### SUFFICIENCY OF THE EVIDENCE

▮▮▮▮ Finally, Gallardo challenges the legal and factual sufficiency of the evidence.[7] In reviewing the legal sufficiency of the evidence, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We resolve any inconsistencies in the testimony in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex.Crim.App. 2000). On the other hand, when reviewing a factual sufficiency challenge, "we review all of the evidence in a neutral light, and we will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met." *Garza v. State*, 213 S.W.3d 338, 344 (Tex.Crim.App. 2007).

The State's theory was that Patino and Botello were kidnapped and murdered at Gallardo's direction in retaliation for their taking the "cuota" that belonged to him. The jury was charged pursuant to the law of parties that it could find Gallardo guilty if it found beyond a reasonable doubt either that Gallardo committed the aggravated kidnapping and murder offenses or that one of the co-defendants committed the offenses and Gallardo, acting with intent to promote or assist the commission of the offenses, solicited, encouraged, directed, or aided the commission of the offenses. *See* TEX. PENAL CODE ANN. § 7.02(a)(2). Gallardo contends the evidence is legally insufficient to support the aggravated kidnapping and murder convictions because the State presented no physical evidence connecting him to the crimes, no evidence he intended the victims to be kidnapped or murdered, and proved only that he was merely present before the offenses occurred.[8]

▮▮▮▮ Gallardo is correct that there is no physical evidence tying him to the crimes and the evidence used to convict was largely circumstantial. However, the lack of direct evidence is not dispositive. Circumstantial evidence is as probative as direct evidence in establishing guilt. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim. App.2004). And the jury is permitted to draw multiple reasonable inferences from the evidence presented as long as each is

---

**7.** In his points of error, Gallardo asserts the trial court erred "in denying and overruling [his] motion for instructed verdict since the evidence was both legally insufficient as well as factually insufficient to support the conviction" as to each count. A challenge to the denial of a motion for instructed verdict is actually a challenge to the legal sufficiency of the evidence. *Madden v. State*, 799 S.W.2d 683, 686 (Tex.Crim.App.1990), *cert. denied*, 499 U.S. 954, 111 S.Ct. 1432, 113 L.Ed.2d 483 (1991). However, because Gallardo includes a brief argument addressing factual sufficiency in the substance of his brief, we will construe the issues as challenging both

the legal and factual sufficiency of the evidence.

**8.** Gallardo's brief also lists points of error challenging the sufficiency of the evidence to support the two convictions for engaging in organized criminal activity. However, the brief does not contain any argument separately addressing the sufficiency of the evidence on these counts. We therefore overrule these points as inadequately briefed. *See* TEX.R.APP. P. 38.1(h); *Russeau v. State*, 171 S.W.3d 871, 881 (Tex.Crim.App.2005), *cert. denied*, 548 U.S. 926, 126 S.Ct. 2982, 165 L.Ed.2d 989 (2006).

supported by the record. *Hooper v. State,* 214 S.W.3d 9, 15 (Tex.Crim.App.2007); *Guevara,* 152 S.W.3d at 49. In reviewing the sufficiency of the evidence, we look at " 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.' " *Guevara,* 152 S.W.3d at 49 (quoting *Cordova v. State,* 698 S.W.2d 107, 111 (Tex.Crim.App. 1985)). "Each fact need not point directly and independently to the guilt of appellant, as long as the cumulative effect of all the incriminating facts are sufficient to support the conviction." *Id.*

 The State demonstrated that Gallardo, a Mexican Mafia member, went to 4001 Chickasaw Lane on January 15, 2005, with other gang members to find out what had happened to the "cuota" or money Vera and Morales owed him and the organization and "to do something about it." Gallardo did the talking and told everyone else what to do. When he learned Patino and Botello had taken his money, Gallardo was enraged. He knew Patino was living at the house and told Morales he was leaving Reyes, Pena, and Esparza at the house to show her his "protection." According to Morales, Gallardo was present when Patino arrived and he directed Reyes to grab Patino. However, Joey Alegria testified Gallardo had already left when Patino arrived and Reyes forced Patino to the ground at gunpoint. Reyes then called Gallardo, as Gallardo had instructed him to do.

After Reyes called and talked to Gallardo, Joey asked Reyes why he did not go ahead and beat Patino and be done with it. Reyes responded, "[N]o;" that Gallardo needed to talk to Patino and that "they were going to be taken." When Botello arrived at the house, he was also bound and gagged. Pena called Gallardo and a car arrived at the house after dark to transport the victims. Reyes had the bound and gagged victims placed in the trunk of the car and Pena left in the car. Shortly after 8:00 p.m., the sheriff's department was alerted to the burning car and the victims' bodies were discovered.

From this evidence a reasonable jury could infer Gallardo directed Reyes, Pena, and Esparza to seize Patino and Botello so they could be punished for stealing Gallardo's money; it is also a reasonable inference that Gallardo intended a punishment more severe than a beating. The jury was free to believe Joey Alegria's testimony that Gallardo wanted the victims taken to him and that soon after Pena talked to Gallardo, the victims were placed in the trunk of a car and driven away. This testimony leads to a reasonable inference that Gallardo saw the men after the kidnappings and before the murders. Because Gallardo was clearly directing the activities at the house, it was reasonable for the jury to infer he continued to direct the outcome of this criminal episode. It was not unreasonable for a jury to conclude beyond a reasonable doubt that at the very least Gallardo, intending to promote or assist the commission of the kidnappings and murders, solicited, encouraged, or directed Pena or one of the other co-defendants to commit these offenses. We therefore overrule Gallardo's legal sufficiency points.

In support of his argument that the evidence is factually insufficient, Gallardo argues Joey Alegria's and Morales's testimony conflicted with respect to some details and that Esparza's testimony provided "overwhelming evidence" contrary to the verdict. We disagree. The jury was entirely within its province to believe the version of the events established by the State and to disbelieve Esparza. Based on

the evidence, the jury's verdict is not clearly wrong or manifestly unjust.

The trial court's judgment is affirmed.