*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*


# MEMORANDUM OPINION

No. 04-10-00803-CR

Ismael **GONZALEZ**, Jr.,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 79th Judicial District Court, Jim Wells County, Texas
Trial Court No. 09-09-12748-CR
Honorable Richard C. Terrell, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Catherine Stone, Chief Justice
Karen Angelini, Justice
Rebecca Simmons, Justice

Delivered and Filed:  April 18, 2012

AFFIRMED

A jury convicted Ismael Gonzalez Jr. of the offense of capital murder. In two issues, Gonzalez argues his conviction should be reversed because (1) the jury was not instructed to decide if a State's witness was an accomplice, and (2) the prosecutor engaged in improper argument. We overrule both issues, and affirm the trial court's judgment.

**BACKGROUND**

On July 17, 2009, law enforcement officers found human remains in an isolated area in Jim Wells County, Texas. The remains consisted of twenty-five human bones. No skull was found. DNA testing showed the remains were those of Enrique Hughes, who had been reported missing more than eight months earlier.

After an investigation, Gonzalez was charged with capital murder. The indictment alleged Gonzalez murdered Hughes in the course of committing or attempting to commit the offenses of retaliation, kidnapping, or robbery. Also indicted for Hughes's murder were Gonzalez's brother, Justin Lopez, and a family friend, Robert Farias. Leroy Trigo was a witness but was not charged or indicted in connection with the crime. Gonzalez and Lopez pled not guilty. Farias pled guilty to Hughes's murder. Gonzalez and Lopez were tried jointly.

*Evidence Related to the Investigation*

Much of the evidence at trial related to the investigation of this case, which began as a missing person case. Hughes was reported missing by his wife on November 3, 2008. For about eight months, law enforcement officers were unable to discover what had happened to Hughes. Then, on July 17, 2009, officers received a tip that Hughes's remains were located in Jim Wells County, Texas, near the intersection of FM 1554 and FM 625. When officers went to the site, they found what appeared to be a grave and some human bones.

The tip that led to the discovery of Hughes's remains was provided by Farias. After the remains were found, Farias was interviewed numerous times by investigators and made several statements. Some of these statements were videotaped; one of them was written. In these statements, Farias implicated Gonzalez and Lopez in Hughes's murder. Farias also mentioned Trigo in his written statement.

In addition, Farias led investigators to items important to the case. Most of these items were found on the compound in Jim Wells County where Gonzalez lived with other family members. The items included a belt buckle, buttons, a gold chain, keys, and eyeglasses, all of which were identified as belonging to Hughes. Hughes's cell phone and a knife alleged to be the murder weapon had been buried on some property adjacent to the compound. All of the items had been burned. Farias also showed investigators tools on the compound that he claimed were used to dig a grave for Hughes's body.

Additionally, investigators obtained cell phone records. These records showed that on November 1 and 2, 2008, more than twenty calls were made from Hughes's cell phone to a cell phone belonging to Gonzalez's mother. These records also showed several calls were made from a cell phone belonging to Gonzalez's mother to Hughes's cell phone on November 2, 2008.

### Testimony of Robert Farias

The main witness to testify on the State's behalf was Robert Farias. According to Farias's trial testimony, he was living with Gonzalez and Lopez at their family compound in Jim Wells County in November 2008. The compound consisted of two trailers on a tract of land. Seven people, including Gonzalez and his mother, Gloria Lopez, lived in one trailer. Lopez lived in the other trailer. On November 2, 2008, Gloria received a phone message from Hughes, which she shared with Farias and her family members. Gonzalez was angered by the message.

That evening, Lopez and Farias drove to Hughes's house in Farias's truck. Lopez persuaded Hughes to get into Farias's truck, and they all went to the Gonzalez/Lopez compound. Upon exiting the truck, Lopez hit Hughes in the head and knocked him unconscious. Lopez also bound Hughes's hands and feet. Gonzalez, who had been inside one of the trailers, came outside. All three men then loaded Hughes into the back of the truck. Trigo, who was a neighbor, then

walked up to see what they were doing. Trigo saw Hughes in the back of the truck and left. Lopez, Gonzalez, and Farias then drove Hughes to an isolated location about two miles away from the compound. When they arrived at the location on FM 1554 near FM 625, Hughes was taken out of the back of the truck. Gonzalez and Lopez dragged Hughes away from the road. They told Farias to drive the truck away and come back for them. Farias did what he was told. After about five minutes, Farias returned to the site and picked up Gonzalez and Lopez. As Farias drove back to the compound, Gonzalez told him he had stabbed Hughes.

Upon returning to the compound, Gonzalez, Lopez, and Farias picked up supplies to bury Hughes's body. After equipping themselves with shovels, a grub hoe, and water, Gonzalez, Lopez, and Farias drove back to the site where Hughes had been killed, dug a grave, and put Hughes's body in it. Upon returning to the compound, Gonzalez, Lopez, and Farias removed their clothing, placed it in a pile between the two trailers, and burned it. They also burned many of Hughes's belongings, including his clothes and his cell phone, in a discarded bathtub located outside one of the trailers. The following day Lopez and Farias gathered some items from the bathtub that did not incinerate completely, including Hughes's cell phone and the murder weapon, and buried them on the property adjacent to the compound.

During cross-examination, defense counsel focused on statements Farias provided investigators, including the written statement he made on August 10, 2009. According to Farias's written statement, Trigo did not merely walk up, see Hughes in the back of the truck, and leave. Instead, when Trigo saw Hughes in the back of the truck he "insist[ed]" on getting his gun "to kill Mr. Hughes," but was told by Gonzalez and Lopez that they were "just going to break [Hughes's] neck and dump him [on] another property." Then, according to the written statement, Trigo got into the truck with Gonzalez, Lopez, and Farias, and accompanied them to the site

where Hughes was murdered. Before the murder took place, however, Trigo drove the truck away from the site. After the murder, Trigo returned to the site in the truck, picked up Gonzalez, Lopez, and Farias, and took them back to the compound, where they retrieved a shovel, a pickaxe, and water. Trigo then drove Gonzalez, Lopez, and Farias back to the site where Hughes had been murdered. Gonzalez, Lopez, and Farias jumped off the truck and Trigo drove away. After Gonzalez, Lopez, and Farias buried the body, Farias called Trigo to come and pick them up again. When Trigo pulled up in the truck, Gonzalez, Lopez, and Farias jumped in the back of the truck and Trigo drove them back to the compound. Farias's written statement was admitted into evidence.

On re-direct examination, Farias testified that some of the claims he had made in his written statement were untrue. Specifically, Farias testified that Trigo merely walked up while Hughes was in the back of the truck, saw Hughes there, and left. Trigo did not mention getting a gun to kill Hughes. Trigo did not accompany Gonzalez, Lopez, and Farias to the site where Hughes was killed. Trigo did not drive the truck to pick up Gonzalez, Lopez, and Farias that night.

### *Testimony of Leroy Trigo*

Trigo testified on the State's behalf as well. Trigo testified that on November 2, 2008, at around 10:00 p.m., he walked from his house to the Gonzalez/Lopez compound. He saw Gonzalez, Lopez, and Farias outside, and he asked them what they were doing. The three men indicated they were doing something but provided no details. Trigo was looking for a cigarette, so he went inside and talked to Gloria for about ten minutes. As he was leaving, Trigo saw Gonzalez, Lopez, and Farias drive off in the truck. As they drove off, Trigo noticed that someone was in the back of the truck lying face down with his hands and feet tied.

Several days later, Gonzalez admitted to Trigo that he and Lopez had murdered Hughes. Gonzalez said his mother had received a phone call from Hughes, and Gonzalez and Lopez were angry about it, so they took care of Hughes. Gonzalez said he and Lopez took Hughes somewhere and took turns stabbing him.

A few days after Gonzalez made these admissions, Trigo borrowed Farias's truck. While he was driving Farias's truck, Farias called Trigo and instructed him to go pick up Gonzalez and Lopez on FM 1554 by FM 625. Trigo complied with Farias's request. When Gonzalez and Lopez got into the back of the truck, Trigo noticed they were sweaty and smelled like garbage and dead animal. Trigo also noticed that Gonzalez and Lopez had shovels with them.

Finally, Trigo recalled that one time when he and Gonzalez were driving on FM 1554 going toward FM 625, Gonzalez remarked "this is where it was." The location was close to the site where Trigo had picked up Gonzalez and Lopez in November 2008.

After the close of the evidence, the jury was instructed that Farias was an accomplice as a matter of law, and was cautioned that it could not convict Gonzalez unless Farias's testimony was corroborated by other evidence tending to connect Gonzalez with the charged offense. The issue of whether Trigo was an accomplice as a matter of fact was not submitted to the jury. The jury found Gonzalez guilty of capital murder as charged in the indictment.

## CHARGE ERROR

In his first issue, Gonzalez argues there was sufficient evidence to raise a question as to whether Trigo was an accomplice as a matter of fact, and therefore, this question should have been submitted to the jury. Gonzalez argues it was crucial for the jury to have made an initial determination as to whether Trigo was an accomplice because if the jury decided Trigo was an accomplice, Trigo's testimony could not have been used to corroborate Farias's testimony.

Gonzalez acknowledges he never requested a jury instruction on this matter; however, Gonzalez asserts he is entitled to a reversal of his conviction because he was egregiously harmed by the error.

Under the accomplice witness rule, "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2004). The corroborating evidence need not be sufficient by itself to establish guilt; the non-accomplice evidence must simply link the accused in some way to the commission of the crime, such that rational jurors could conclude this evidence sufficiently tended to connect the accused to the offense. *Simmons v. State*, 282 S.W.3d 504,508 (Tex. Crim. App. 2009); *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994). One accomplice witness's testimony may not corroborate the testimony of another accomplice witness. *Badillo v. State*, 963 S.W.2d 854, 857 (Tex. App.—San Antonio 1998, pet. ref'd). Because of the accomplice witness rule, juries are instructed they cannot convict a defendant unless there is also some non-accomplice testimony tying the defendant to the offense. *Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006).

A witness is an accomplice if he participates with a defendant in the commission of a crime by doing some affirmative act, with the requisite culpable mental state, that promotes the commission of the offense. *Id.* at 748; *Gallardo v. State*, 281 S.W.3d 462, 469 (Tex. App.—San Antonio 2007, no pet.). A witness's mere presence at a crime scene does not make him an accomplice. *Cocke*, 201 S.W.3d at 748; *Gallardo*, 281 S.W.3d at 469. "A witness is not an accomplice witness merely because he or she knew of the offense and did not disclose it, or even if he or she concealed it." *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). "There

must exist evidence sufficient to connect the alleged accomplice to the criminal offense as a 'blameworthy participant,' but whether the alleged accomplice-witness is actually charged or prosecuted for his participation is irrelevant." *Cocke*, 201 S.W.3d at 748.

A witness may be an accomplice as a matter of law or as a matter of fact. *Id.* at 747. The evidence in a case determines which jury instruction, if any, needs to be given. *Id*. When a witness has been charged with the same offense as the defendant or a lesser included offense or when the evidence clearly shows that the witness could have been so charged, the trial judge has a duty to instruct the jury that the witness is an accomplice as a matter of law. *Druery*, 225 S.W.3d at 498; *Gallardo*, 281 S.W.3d at 470. When there is some evidence of an affirmative act on the part of the witness to assist in the commission of the charged or a lesser included offense, but the evidence is conflicting and it remains unclear whether the witness is an accomplice, the trial court should allow the jury to decide whether the witness is an accomplice witness as a matter of fact under instructions defining the term "accomplice." *Druery*, 255 S.W.3d at 498-99; *Gallardo*, 281 S.W.3d at 470.

Here, the evidence at trial showed Trigo was not indicted for Hughes's kidnapping or murder. In their testimony, both Farias and Trigo denied that Trigo participated in the kidnapping or the murder. In fact, no one testified that Trigo participated in the kidnapping or the murder. The only evidence Gonzalez points to that might have raised a question about Trigo's accomplice status was Farias's written statement, which was not entirely consistent with Farias's trial testimony. However, according to the statement, Trigo did not appear on the scene until after Hughes had been tied up and placed in the back of the truck. Although the statement says Trigo accompanied Gonzalez, Lopez, and Farias to the site where Hughes was murdered, the statement also says Trigo left the scene before the murder took place. Finally, the statement says

Trigo drove back to the site twice to pick up Gonzalez, Lopez, and Farias, but these actions took place after Hughes was murdered.

After carefully reviewing the statement, we conclude it fails to raise a fact issue as to whether Trigo took any affirmative act to assist in the murder or a lesser included offense. Before a witness may be considered an accomplice, there must be some evidence the witness committed an affirmative act to assist in the commission of the offense. *Kunkle v. State*, 771 S.W.2d 435, 441 (Tex. Crim. App. 1986). In the absence of such an act, he cannot be an accomplice witness, even as a matter of fact. *Id*. At most, the statement in this case indicates Trigo was present during Hughes's kidnapping. However, it is well-established that mere presence at a crime scene is not enough to raise a fact issue as to a witness's accomplice status. *See Druery*, 225 S.W.3d at 500 (holding mere presence at the crime scene did not render witnesses accomplices); *Gallardo*, 281 S.W.3d at 470 (same). Nor was Trigo's knowledge of the crime or his failure to disclose it sufficient to raise a question as to his accomplice status. *See Druery*, 225 S.W.3d at 500 (holding witnesses were not accomplices because they knew of the planned offense and failed to disclose it); *Gallardo*, 281 S.W.3d at 470 (same). Aside from Farias's statement, there is nothing in the record even suggesting Trigo committed an affirmative act to assist in the commission of the charged offense or a lesser included offense. We, therefore, hold the failure to present the question of Trigo's accomplice status to the jury was not error. Gonzalez's first issue is overruled.

## IMPROPER JURY ARGUMENT

In his second issue, Gonzalez complains the prosecutor engaged in improper argument by attacking defense counsel. There are four permissible areas of jury argument: (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) an answer to the argument of

opposing counsel, and (4) a plea for law enforcement. *Campbell v. State*, 610 S.W.2d 754, 756 (Tex. Crim. App. 1980). The State may not use closing argument to strike at a defendant over the shoulders of his counsel, or accuse defense counsel of bad faith or insincerity. *Fuentes v. State*, 664 S.W.2d 333, 335 (Tex. Crim. App. 1984). Texas courts maintain a "special concern for final arguments that result in uninvited and unsubstantiated accusation of improper conduct directed at a defendant's attorney." *Mosley v. State*, 983 S.W.2d 249, 258 (Tex. Crim. App. 1998). As a consequence, trial judges should assume responsibility for preventing this type of argument. *Id.* In its most egregious form, this type of argument may involve accusations of manufactured evidence, or an attempt to contrast the ethical obligations of prosecutors and defense attorneys. *Id.*

In order to preserve an improper jury argument complaint, a defendant must object to the argument and pursue the objection until the trial court rules adversely. *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). A defendant may not complain of improper jury argument for the first time on appeal. *Id.* An argument attacking the character of a defendant's attorney is not a constitutional violation; instead, such arguments are characterized as falling outside the areas of permissible argument. *Mosley*, 983 S.W.2d at 259; *George v. State*, 117 S.W.3d 285, 289 (Tex. App.—Texarkana 2003, pet. ref'd).

Here, Gonzalez complains of multiple comments made by the prosecutor during closing argument. However, defense counsel objected to only one of these comments. We, therefore, address the only complaint that has been preserved for appellate review. *See Cockrell*, 933 S.W.3d at 89 (holding the defendant's failure to object to a jury argument forfeited his right to complain about the argument on appeal).

The evidence showed Farias led police investigators to the site where Hughes's cell phone and the alleged murder weapon had been buried. According to Farias, the items had been buried at the site about eight months earlier. Investigators took photographs of the site. On cross-examination, one of the investigating officers testified that the dirt at the site where the cell phone and the alleged murder weapon were found appeared to be undisturbed. Thereafter, defense counsel asked the officer if he had any photographs that showed the site was undisturbed. The officer responded that he did. Defense counsel then stated that none of these photographs were admitted into evidence. The officer responded that he believed they were admitted into evidence.

During closing argument, the prosecutor reminded the jury of the photographs of the site where the cell phone and the alleged murder weapon were found. The prosecutor also reminded the jury of defense counsel's cross-examination of the investigating officer and the controversy about whether the dirt at the site was undisturbed. The prosecutor further informed the jury that a photograph showing the site before the items were dug up was objected to by defense counsel. Shortly thereafter, the prosecutor stated, "[I]f you'll recall, while it was going on, I felt maybe it was just some confusion, I'll try to give them the document (sic). That's not the way you practice law." At this point, defense counsel objected on the basis of "improper closing." The trial court overruled the objection.

On appeal, Gonzalez argues the prosecutor's comment, "That's not the way you practice law," was improper because it accused defense counsel of not practicing law properly. The State argues Gonzalez misinterprets the comment. According to the State, the comment was directed at the prosecutor, not at defense counsel. The State further argues the comment was made in

response to defense counsel's arguments that the prosecutor hid, fabricated, or manipulated the evidence.

We cannot say the comment amounted to an impermissible attack on defense counsel. The comment makes no express reference to defense counsel. Even when considered in the context of the surrounding argument, it is not clear that the comment was directed at defense counsel. We, therefore, hold the trial court did not err in overruling defense counsel's objection. Gonzalez's second issue is overruled.

## CONCLUSION

The judgment of the trial court is affirmed.

Karen Angelini, Justice

DO NOT PUBLISH