Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio



# MEMORANDUM OPINION

No. 04-10-00864-CR

Justin **LOPEZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 79th Judicial District Court, Jim Wells County, Texas
Trial Court No. 09-09-12750-CR
Honorable Richard C. Terrell, Judge Presiding

Opinion by:   Karen Angelini, Justice

Sitting:   Karen Angelini, Justice
Sandee Bryan Marion, Justice
Steven C. Hilbig, Justice

Delivered and Filed:   April 26, 2012

AFFIRMED

A jury convicted Justin Lopez of the offense of capital murder. In six issues, Lopez complains of (1) the denial of his pretrial motion for continuance; (2) limitations placed on voir dire; (3) the absence of certain jury instructions; (4) the sufficiency of the accomplice witness corroboration evidence; (5) the prosecutor's jury argument; and (6) cumulative error. We affirm.

**BACKGROUND**

The indictment in this case alleged Justin Lopez murdered Enrique Hughes in the course of committing or attempting to commit the offenses of retaliation, kidnapping, or robbery. Lopez's brother, Ismael Gonzalez, was charged in the same indictment. Lopez and Gonzalez pled not guilty to the allegations in the indictment and were tried jointly.

The evidence at trial showed Hughes was reported missing by his wife, Dahlia Hughes, on November 3, 2008. Mrs. Hughes told an officer from the Alice Police Department that she last saw her husband on November 2, 2008, with Roxanne Robledo and another girl. An investigator contacted and interviewed Robledo, who confirmed that she and Melissa Casas had been with Hughes on November 2, 2008. An investigator also contacted and interviewed Casas. For about eight months, investigators were unable to determine what had happened to Hughes.

On July 17, 2009, the Alice Police Department received a tip that human remains were located in Jim Wells County, Texas, near the intersection of FM 1554 and FM 625. When officers went to the site, they found what appeared to be a grave and about twenty-five human bones. No skull was found. DNA testing showed the bones belonged to Hughes.

The tip that led to the discovery of Hughes's remains was provided by Robert Farias. Farias was interviewed by police investigators and made multiple statements. Farias said Lopez and Lopez's brother, Ismael Gonzalez, murdered Hughes by stabbing him with a knife. Farias also led investigators to other items important to the case. Most of these items were found on the compound in Jim Wells County where Lopez and Farias lived with other members of Lopez's family. The items included eyeglasses, a belt buckle, and a gold chain, all of which were identified as belonging to Hughes. Hughes's cell phone and a knife alleged to be the murder

weapon were found buried on a lot adjacent to the compound. All of the items appeared to have been burned.

In his trial testimony, Farias stated that Lopez's mother, Gloria Lopez, received a phone message from Hughes on November 2, 2008. Lopez's brother, Gonzalez, was angered by the message. Later that evening, Lopez and Farias drove to Hughes's house in Farias's truck. Lopez persuaded Hughes to get into the truck with them and they drove away. When Hughes tried to use his cell phone, Lopez took it away from him.

Upon returning to the Lopez family compound, Lopez, Farias, and Hughes exited the truck. Lopez hit Hughes in the head, knocking him unconscious. Lopez then tied Hughes's hands and feet. After this was done, Gonzalez came outside. Lopez, Farias, and Gonzalez loaded Hughes into the back of the truck. At this point, a neighbor, Leroy Trigo, walked up and saw Hughes in the back of the truck. Trigo then left. Thereafter, Lopez, Farias, and Gonzalez took Hughes to an isolated area near the intersection of FM 1554 and FM 625 in Jim Wells County, Texas. The site was about two miles from the Lopez family compound. Lopez and Gonzalez lifted Hughes out of the back of the truck, and dragged Hughes several hundred yards away from the road. They told Farias to drive the truck away and come back for them. Farias followed these instructions. After about five minutes, Farias returned to the site and picked up Lopez and Gonzalez. As Farias drove back to the compound, Gonzalez told him he had stabbed Hughes. Later that night, Lopez, Farias, and Gonzalez returned to the site to dig a grave and bury the body. After burying the body, they returned to the compound where they burned their clothing as well as various personal items belonging to Hughes. The following day, Lopez and Farias buried Hughes's cell phone and the murder weapon on the property adjacent to the compound.

On cross-examination, the defense questioned Farias about the various statements he made to investigators. One of these statements, Farias's written statement, was offered into evidence by the defense. In this statement, Farias indicated Trigo did not merely walk up while Hughes was in the back of the truck, see Hughes, and leave. According to Farias's written statement, the following transpired. Trigo saw Hughes in the back of the truck and "insist[ed]" on getting his gun to kill Hughes. Lopez and Gonzalez told Trigo not to get his gun because they were going to break Hughes's neck instead. Trigo then accompanied Farias, Lopez, Gonzalez, and Hughes to a location on FM 1554 near FM 625. After Hughes was unloaded from the back of the truck, Trigo drove away. Later, Trigo drove back to the location, and picked up Farias, Lopez, and Gonzalez.

Nevertheless, on redirect examination, Farias testified the claims he made in his written statement about Trigo were untrue. Farias testified that on the night of the murder, Trigo merely walked up while Hughes was in the back of the truck, saw Hughes, and left.

Leroy Trigo testified that on November 2, 2008, at around 10:30 p.m., he walked from his house to the Lopez family compound. He saw Lopez, Farias, and Gonzalez outside, and he asked them what they were doing. The three men provided no details. Trigo was looking for a cigarette, so he went inside and talked to Lopez's and Gonzalez's mother for about ten minutes. As he was leaving, Trigo saw Gonzalez, Lopez, and Farias drive off in the truck. As they drove off, Trigo noticed that someone was in the back of the truck lying face down with his hands and feet tied.

Trigo further testified that several days later, Gonzalez told him he and Lopez had murdered Hughes. Gonzalez said his mother had received a phone call from Hughes, and Gonzalez and Lopez were angry about it, so they took care of Hughes. Gonzalez said he and

Lopez took Hughes somewhere and took turns stabbing him. A few days later, Trigo borrowed Farias's truck. While he was driving the truck, Farias called Trigo and told him to pick up Gonzalez and Lopez on FM 1554 by FM 625. Trigo complied. When Gonzalez and Lopez got into the back of the truck, Trigo noticed they were sweaty and smelled like "garbage and dead animal." Trigo noticed Gonzalez and Lopez had shovels with them.

Jeremy Trigo testified that shortly after the remains were found near the intersection of FM 1554 and FM 625, investigators came to talk to him because they were looking for his brother, Leroy Trigo. Thereafter, Jeremy had a conversation with Lopez. Initially, Lopez acted like he knew nothing about the remains that had been found. Eventually, however, Lopez told Jeremy that Leroy was not involved in the murder. When Jeremy asked Lopez why he did not burn the body or dispose of the body in a better way, Lopez responded, "Bro, I took care of things, cut him up into pieces and took his head off."

The jury convicted Lopez of the offense charged in the indictment, and Lopez was sentenced to life imprisonment without the possibility of parole. Lopez appealed.

## MOTION FOR CONTINUANCE

In his first issue, Lopez claims the trial court erred in denying his pretrial motion for continuance. Lopez filed a written motion for continuance alleging he was "unduly burdened and surprised and extremely prejudiced" by the State's failure to provide several DVDs, pictures, and witness statements in accordance with the parties' discovery agreement. Four days before trial, on September 16, 2010, Lopez presented his motion for continuance to the trial court.[1] The record indicates that by the time of this hearing, the State had already turned over the DVDs, pictures, and witness statements in question. At the hearing, Lopez argued he needed a continuance because there were about ten DVDs, and he needed time to review them before trial.

---

[1]The record indicates Gonzalez filed and presented a similar motion for continuance.

After considering Lopez's arguments, the trial court noted it was still several days before trial, and there was plenty of time for Lopez to review the material. The trial court further stated it would not rule on the motion for continuance until after Lopez had reviewed the DVDs, pictures, and witness statements provided by the State. The trial court added that if Lopez reviewed the materials and discovered undue surprise, he could reurge his motion for continuance on the day of trial.

On the day of trial, September 20, 2012, Lopez reurged his motion for continuance. Early in the investigation, police had learned that Melissa Casas and Roxanne Robledo had been with Hughes on the day he disappeared. The record indicates Lopez was aware of Casas and Robledo and their potential roles as witnesses long before the pretrial hearing. The record also indicates that about eleven months before trial Lopez had been provided an investigator report expressly referring to a single video statement made by Casas. Nevertheless, in reurging his motion for continuance on the day of trial, Lopez asserted he was surprised because there were two video statements from Casas and one written statement from Robledo. Lopez further complained the investigator report expressly referring to Casas's video statement did not accurately reflect everything in the statement.

On appeal, Lopez asserts he requested a continuance so that he would be able to fully review the statements provided by the prosecutor, and to locate witnesses, presumably Casas and Robledo, to assist in his defense. Lopez argues the trial court abused its discretion in denying his motion for continuance because he established that the content of the videotapes was unknown until the eve of trial and tended to be exculpatory. Lopez further argues that if he had been given more time to investigate the statements provided by Casas and Robledo, he "may" have been able to produce witness testimony that would have corroborated his alternative theory that

someone other than Lopez and Gonzalez was responsible for Hughes's disappearance and murder.

We review the trial court's ruling on a pretrial motion for continuance for an abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007). In order to show reversible error predicated on the denial of a motion for continuance, a defendant must demonstrate both that the trial court erred in denying the motion and that the lack of continuance harmed him. *Gonzales v. State*, 304 S.W.3d 838, 843 (Tex. Crim. App. 2010). A showing that the ruling was in error "'most likely requires a showing that the case for delay was so convincing that no reasonable trial judge could conclude that scheduling and other considerations as well as fairness to the State outweighed the defendant's interest in delay of the trial.'" *Id.* at 843 (quoting George E. Dix & Robert O. Dawson, 42 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 28.56 (2d ed. 2001)). A showing of harm requires the defendant to demonstrate "'with considerable specificity'" how he was harmed by the absence of more preparation time. *Id.* at 842 (quoting Dix et al., *supra*). Such a showing "'can ordinarily be made only at a hearing on a motion for new trial'" because only then "'will the defendant be able to produce evidence as to what additional information, evidence[,] or witnesses the defense would have had available if the motion for delay had been granted.'" *Id.* at 842-43 (quoting Dix et al., *supra*).

Here, the record does not show the trial court erred in denying Lopez's motion for continuance. This case was first set for trial in February 2010. Lopez asked for and obtained one prior continuance because his counsel had a conflicting trial setting. Additionally, the record indicates Lopez was in possession of a report expressly referring to Casas's statement for about eleven months prior to trial. Lopez could have sought Casas's statement from the prosecutor

much earlier than a few days before trial. *See id.* at 843 (recognizing diligence as a prerequisite for a continuance based on trial preparation).

Nor does the record show that Lopez was harmed by the denial of the motion for continuance. Lopez did not reiterate his complaint about the lack of a continuance in his motion for new trial. Lopez never presented any evidence to demonstrate how he was specifically harmed. On appeal, Lopez asserts that if he had been given more time to investigate he "may" have been able to find more evidence supporting his defensive theory that someone else was responsible for Hughes's death. This bald assertion falls far short of establishing what additional information, evidence, or witnesses Lopez would have had available if the motion for continuance had been granted. *See id.* at 842-43; *Heiselbetz v. State*, 906 S.W.2d 500, 512 (Tex. Crim. App. 1995) (holding the trial court did not abuse its discretion in overruling appellant's motion for continuance absent a showing of specific prejudice to the defense). We conclude Lopez has failed to demonstrate that the trial court erred in denying the motion for continuance and that the lack of a continuance harmed him. Lopez's first issue is overruled.

## VOIR DIRE

In his second issue, Lopez argues the trial court abused its discretion in limiting voir dire.

The trial court has broad discretion over the process of selecting a jury. *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002). The trial court is afforded this discretion because without a reasonable limitation voir dire could go on forever. *Id*. A trial court abuses its discretion when it denies a proper question concerning a proper area of inquiry. *Dinkins v. State*, 894 S.W.2d 330, 345 (Tex. Crim. App. 1995). A question is proper if it seeks to discover a juror's views on an issue applicable to the case. *Barajas*, 93 S.W.3d at 38. However, an otherwise proper question is impermissible if it attempts to commit the juror to a particular

verdict based on particular facts. *Id*. Additionally, a question that is so vague or broad in nature as to constitute a global fishing expedition is not proper, and may be prevented by the trial judge. *Id*. at 39. A trial court may also limit voir dire when a question is repetitious. *Dinkins*, 894 S.W.2d at 345.

We review the trial court's decisions limiting voir dire under an abuse of discretion standard. *Id*. A trial court abuses its discretion when its decision is arbitrary or unreasonable. *Montoya v. State*, 291 S.W.3d 420, 426 (Tex. Crim. App. 2009).

### *Time Limitations on General Voir Dire*

Lopez first complains about the time limitations on general voir dire. The record shows the trial court limited general voir dire to thirty minutes for the State and thirty minutes for the defense. Thus, Lopez and Gonzalez had fifteen minutes each for general voir dire. Lopez complained to the trial court about the time limitation, stating it was "kind of short to talk about probation." The trial court responded by stating the time limitation was appropriate because Lopez and Gonzalez were working together and they would be covering many of the same topics during general voir dire.

We conclude the trial court's time limitations on general voir dire did not amount to an abuse of discretion. As a practical matter, Lopez had more than fifteen minutes for general voir dire. Gonzalez did not use his full fifteen minutes for general voir dire, and Lopez was permitted to use Gonzalez's remaining time. In addition, Lopez was able to address probation in the time provided.[2]

### *Disallowing Specific Questions*

Lopez complains about five specific questions disallowed by the trial court during general and individual voir dire.

---

[2]Probation was discussed only in the context of a conviction for a lesser included offense.

During general voir dire, the trial court allowed defense counsel to address the idea that an indictment was not evidence of guilt. The trial court also allowed defense counsel to ask members of the venire if any of them felt Lopez had some sort of guilt based on the fact that he was accused and brought to trial. Eight members of the venire expressed agreement with this statement by raising their cards. Defense counsel then stated:

> But the jurors that raised your cards, if we're supposed to start on an even playing ground and we're presumed to be innocent and you walk in here with the feeling that we've done something wrong because we've been charged, then we're not— we're not starting on the same foot. Would you—you guys agree with that? You see how that's important?

The trial court disallowed the question on the basis that it was an improper commitment question.

On appeal, Lopez argues the trial court abused its discretion in disallowing the question. We disagree. Regardless of whether the question was an improper commitment question, the trial court did not err in disallowing this particular question. At the beginning of voir dire, the trial court advised the venire about the presumption of innocence. Thereafter, defense counsel explained to the venire that an indictment was not evidence of guilt. Defense counsel was then allowed to ask the members of the venire if they felt Lopez was somehow guilty because he had been indicted and brought to trial. Subsequently, defense counsel attempted to ask the above-quoted question. The question, which once again addresses the application of the presumption of innocence, was repetitious and unnecessary. We, therefore, conclude the trial court's decision to disallow this question did not constitute an abuse of discretion.

> During general voir dire, defense counsel asked the venire the following question,

> Is there anyone here…on the lesser included offense that they allege, on kidnapping, robbery, or retaliation, if you heard all of the evidence that you could possibly hear punishment [sic], could still say there's no way I could consider probation?

Lopez complains it was error for the trial court to disallow this question. Again, we disagree. The question, as phrased, was extremely confusing. Moreover, the trial court rephrased the question as follows: "Is there anybody who cannot consider the entire range of punishment if convicted on one of the lesser included offenses, including probation?" The trial court then allowed the venire to answer the question as rephrased. We conclude the trial court's decision to disallow the complained-of question did not constitute an abuse of discretion.

Finally, during individual voir dire, Lopez asked one venire member if she had served as a juror before, asked another venire member a question aimed at "discussing the nature" of the charges, and asked a third venire member if he thought innocent people were in jail. The trial court disallowed all of these questions. In doing so, the trial court did not act arbitrarily or unreasonably. The first question was repetitious because it asked for information—prior jury service—that appeared on the venire member's jury card. *See Dinkins*, 894 S.W.2d at 345. The second question was repetitious because the nature of the charges was thoroughly addressed during general voir dire. *See id*. The third question was so broad in nature as to constitute a global fishing expedition. *See Barajas*, 93 S.W.3d at 39. We conclude the trial court's decision to disallow these questions did not constitute an abuse of discretion.

Lopez's second issue is overruled.

### JURY INSTRUCTIONS

In his third issue, Lopez argues the trial court erred in failing to allow the jury to determine if Leroy Trigo was an accomplice, and in failing to instruct the jury on the law of parties. Lopez did not request an instruction on either issue.[3]

---

[3] The jury was instructed that Farias was an accomplice as a matter of law, and was cautioned that it could not convict Lopez unless Farias's testimony was corroborated by other evidence tending to connect Lopez with the charged offense.

*Accomplice Witness Instruction*

A witness is an accomplice if he participates with a defendant in the commission of a crime by doing some affirmative act, with the requisite culpable mental state, that promotes the commission of the offense. *Gallardo v. State*, 281 S.W.3d 462, 469-70 (Tex. App.—San Antonio 2007, no pet.) (citing *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006)). A witness's mere presence at a crime scene does not make him an accomplice. *Cocke*, 201 S.W.3d at 748; *Gallardo*, 281 S.W.3d at 470. "A witness is not an accomplice witness merely because he or she knew of the offense and did not disclose it, or even if he or she concealed it." *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). "There must exist evidence sufficient to connect the alleged accomplice to the criminal offense as a 'blameworthy participant,' but whether the alleged accomplice-witness is actually charged or prosecuted for his participation is irrelevant." *Cocke*, 201 S.W.3d at 748.

When a witness has been charged with the same offense as the defendant or a lesser included offense or when the evidence clearly shows that the witness could have been so charged, the trial judge has a duty to instruct the jury that the witness is an accomplice as a matter of law. *Druery*, 225 S.W.3d at 498; *Gallardo*, 281 S.W.3d at 470. When there is some evidence of an affirmative act on the part of the witness to assist in the commission of the charged or a lesser included offense, but the evidence is conflicting and it remains unclear whether the witness is an accomplice, the trial court should allow the jury to decide whether the witness is an accomplice witness as a matter of fact under instructions defining the term "accomplice." *Druery*, 255 S.W.3d at 498-99; *Gallardo*, 281 S.W.3d at 470.

In the present case, Lopez asserts the evidence raised a fact issue as to whether Trigo was an accomplice, and therefore, the trial court should have instructed the jury on this matter.

Virtually all of the evidence at trial showed Trigo was not involved in the commission of the offense or a lesser included offense. The only evidence that arguably raised a question about Trigo's accomplice status was Farias's written statement. Nevertheless, even this statement failed to raise a fact question as to Trigo's accomplice status. According to this statement, Trigo did not participate in either the kidnapping or the murder. Trigo walked up after Hughes had been tied up and placed in the back of the truck. Trigo then accompanied Lopez and the others to an isolated location on the highway near where the murder took place. Trigo, however, left before the murder took place. Although Trigo later returned to the location to pick up Lopez and the others, this action took place after Hughes was murdered. Thus, Farias's written statement, which shows Trigo was merely present during the kidnapping, was insufficient to connect Trigo to the offense as a blameworthy participant. We conclude the evidence fails to show that Trigo engaged in some affirmative act, with the requisite culpable mental state, to promote the commission of the offense. Therefore, the trial court did not err in failing to have the jury decide whether Trigo was an accomplice.

### Law of Parties Instruction

Lopez next argues the trial court erred in failing to instruct the jury on the law of parties. The Texas Court of Criminal Appeals has explained the test for ascertaining whether the trial court should submit an instruction on the law of parties in the following manner:

> [T]he trial court should first remove from consideration the acts and conduct of the non-defendant [or co-defendant] actor[s]. Then, if the evidence of the conduct of the defendant then on trial would be sufficient, in and of itself, to sustain the conviction, no submission of the law of principals [parties] is required....On the other hand, if the evidence introduced upon the trial of the cause shows, or raises an issue, that the conduct of the defendant then upon trial is not sufficient, in and of itself, to sustain a conviction, the State's case rests upon the law of principals [parties] and is dependent, at least in part, upon the conduct of another. In such a case, the law of principals [parties] must be submitted and made applicable to the facts of the case.

*Brown v. State*, 716 S.W.2d 939, 944 (Tex. Crim. App. 1986) (quoting *McCuin v. State*, 505 S.W.2d 827, 830 (Tex. Crim. App. 1974)). Thus, an instruction on the law of parties is required when the defendant criminally participated in the offense charged but there is no evidence that he personally committed each of the elements of the offense. *See id*.

Here, Lopez argues the trial court erred in failing to instruct the jury on the law of parties because there was no evidence that Lopez himself stabbed Hughes. According to Lopez, the evidence showed that only Gonzalez stabbed Hughes. Lopez mischaracterizes the evidence. The evidence showed that Gonzalez told Leroy Trigo that he and Lopez took turns stabbing Hughes. Thus, there was some evidence that Lopez stabbed Hughes. Because there was some evidence that Lopez's conduct in and of itself was sufficient to sustain a conviction, no instruction on the law of parties was required.

Lopez's third issue is overruled.

### SUFFICIENCY OF CORROBORATION

In his fourth issue, Lopez argues the evidence was insufficient to support his conviction because the testimony of Farias, an accomplice witness, was not sufficiently corroborated.

Under the accomplice witness rule, "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). The corroborating evidence need not be sufficient by itself to establish guilt; the non-accomplice evidence must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude this evidence sufficiently tended to connect the accused to the offense. *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009). "All that is required is that there be *some*

non-accomplice witness evidence which *tends* to connect the accused to the commission of the offense alleged in the indictment." *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994). (emphasis in original). The "tends-to-connect" standard is not a high threshold. *See Cantelon v. State*, 85 S.W.3d 457, 461 (Tex. App.—Austin 2002, no pet.). Even apparently insignificant incriminating circumstances may sometimes provide satisfactory evidence of corroboration. *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996).

In reviewing corroboration under the accomplice witness rule, we view the evidence in the light most favorable to the jury's verdict. *See Gill*, 873 S.W.2d at 48. We eliminate all accomplice witness testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the offense. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). We review the non-accomplice evidence together, rather than as isolated, unrelated incidents. *Simmons*, 282 S.W.3d at 511.

Apart from Farias's testimony, there was ample evidence linking Lopez to the offense. Leroy Trigo's testimony tended to connect Lopez to the offense. Trigo testified as follows. On the night of the murder, Trigo was at the Lopez compound and saw Lopez, Gonzalez, and Farias near Farias's truck. In the back of the truck was "a tall, skinny guy tied up face down with his hands behind his back."[4] Several days later, Gonzalez told him his mother, Gloria, had received a phone call from Hughes, and Gonzalez and Lopez were angry about it, so they took care of Hughes. Gonzalez said he and Lopez murdered Hughes. Specifically, Gonzalez said he and Lopez took turns stabbing Hughes. Several days after Gonzalez made these statements, Trigo used Farias's truck to pick up Lopez and Gonzalez near the site where investigators found

---

[4]Hughes's widow testified he was slim and tall.

Hughes's remains. Trigo noticed that when Lopez and Gonzalez got into the truck they were carrying shovels and smelled "like garbage and dead animal."

Jeremy Trigo's testimony also tended to connect Lopez with the offense. Jeremy testified that shortly after Hughes's remains were found he had a conversation with Lopez. According to Jeremy's testimony, Lopez assured him that Leroy Trigo was not involved in Hughes's disappearance. Jeremy also stated that Lopez told him no one would find out who murdered Hughes because he "took care of things, cut him up into pieces and took his head off."

Additional evidence tended to connect Lopez with the offense. Investigators found some, but not all, of Hughes's remains. Cell phone records showed more than twenty calls from Hughes's cell phone to Gloria Lopez's cell phone on November 1 and 2, 2008, and several calls from Gloria Lopez's cell phone to Hughes's cell phone on November 2, 2008. Additionally, a number of Hughes's personal belongings were found on the Lopez family compound, and Hughes's cell phone was found buried on the lot adjacent to the Lopez family compound. These items appeared to have been burned.

Viewing all of the non-accomplice evidence together and in the light most favorable to the jury's verdict, we conclude rational jurors could have found the evidence tended to connect Lopez with the offense. Lopez's fourth issue is overruled.

## JURY ARGUMENT

In his fifth issue, Lopez argues he is entitled to a reversal of his conviction because the prosecutor engaged in improper jury argument.

Proper jury argument falls into one of four categories: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument of opposing counsel, and (4) plea for law enforcement. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). An

argument that strikes at the defendant over the shoulders of defense counsel is improper. *Coble v. State*, 871 S.W.2d 192, 205 (Tex. Crim. App. 1993). An argument attacking the character of a defendant's attorney is characterized as argument falling outside the four permissible categories of argument. *Mosley v. State*, 983 S.W.2d 249, 258 (Tex. Crim. App. 1998). Even when argument falls outside the four permissible categories of argument, it generally does not constitute reversible error unless, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding. *Wesbrook*, 29 S.W.3d at 115.

An appellant may not complain of improper jury argument for the first time on appeal. *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Crim. App. 2004). In order to preserve an improper jury argument complaint, a defendant must object to the argument and pursue the objection to an adverse ruling. *Cockrell v. State*, 933 S.W.3d 73, 89 (Tex. Crim. App. 1996).

Here, Lopez complains of two remarks made by the prosecutor during closing argument; however, the record shows that only one of these was properly preserved for appellate review by an objection and an adverse ruling. We address only the complaint that was preserved for appellate review by an objection and an adverse ruling. *See id*. (holding the appellant's failure to object in the trial court forfeited his right to complain about improper jury argument on appeal).

Lopez's complaint corresponds to the following excerpt from the prosecutor's closing argument:

> Now, you also remember when you came into the courtroom, when this trial started, the Judge apologized because we took a little time because we were pre-introducing evidence. I had a bunch of pictures. Now the pictures that they had agreed to produce were already in, and I didn't have to go through the process. They didn't have to stand up. This one, they objected to. "Oh what a tangled web we weave, when first we practice to deceive." Now—and if you'll recall, while it was going on, I felt maybe it was just some confusion, I'll try to give them the document (sic). That's not the way you practice law.

At this juncture, defense counsel objected, "Your Honor, improper questioning—improper closing," and the trial court overruled the objection.

On appeal, Lopez complains the prosecutor's remark, "That's not the way you practice law," was improper because it casts aspersion on the ethics of defense counsel. Lopez further complains the argument constitutes reversible error because it inserted new evidence—the evidentiary maneuvering that takes place between the lawyers and the judge—into the trial. The State counters the argument was proper because the prosecutor was responding to defense counsel's argument that the State had hidden or fabricated photographs showing the site where Hughes's cell phone and the murder weapon were found. According to the State, the prosecutor was informing the jury that the prosecutor did not practice law by hiding or fabricating evidence. The State further points out that the remark, "Oh what a tangled web we weave, when first we practice to deceive," was first made by defense counsel during closing argument.

Based on this record, it is not clear that the complained-of remark was an attack on defense counsel. The remark does not expressly refer to defense counsel. Even when considered in the context of the surrounding argument, it is not clear that the remark was directed at defense counsel. The remark could reasonably be interpreted as a response to defense counsel's argument that the State had hidden or fabricated evidence. We, therefore, conclude the trial court did not err in overruling defense counsel's objection. Lopez's fifth issue is overruled.

## CUMULATIVE ERROR

In his sixth issue, Lopez argues his conviction should be reversed because of the cumulative effect of the errors in this case. However, in our review of Lopez's first five issues, we have found no error. As the Court of Criminal Appeals has stated, "[w]e are aware of no

authority holding that non-errors may in their cumulative effect cause error." *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999). Lopez's sixth issue is overruled.

**CONCLUSION**

The judgment of the trial court is affirmed.

Karen Angelini, Justice

DO NOT PUBLISH