In The

# *Court of Appeals*

# *Ninth District of Texas at Beaumont*

_____

### NO. 09-11-00379-CR
_____


### QUINTIN JOSHUA FISHER, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 258th District Court**
**Polk County, Texas**
**Trial Cause No. 21060**

## MEMORANDUM OPINION

Appellant, Quintin Joshua Fisher, was convicted by a jury of capital murder. Fisher was sentenced to confinement for life without parole in the Texas Department of Criminal Justice. On appeal, Fisher argues that he was denied effective assistance of counsel at trial, that the trial court erred in denying him a hearing on his motion for new trial and in denying his motion for new trial, that there is insufficient evidence to corroborate the accomplice witness testimony and insufficient evidence to support his conviction. We affirm the judgment of the trial court.

## I.     BACKGROUND

Around 10:30 p.m. on August 21, 2009, R.K. was in his trailer with his wife and daughter when two men entered the trailer with guns.  R.K. and C.K. were both hit over the head with a gun, and the intruders began demanding that R.K. tell them where the money was. R.K.'s parents lived in a house on the same property and a local business nearby.  R.K. told the intruders that the money was in the house.  The intruders used R.K.'s keys to open the back door of the house, and the two intruders forced them to go inside.  R.K.'s brother, B.K., was asleep on the living room couch and his brother, L.W., was sleeping in a nearby chair.  R.K. testified that when the intruders turned on the lights, B.K. yelled, "He's got a gun."  Immediately thereafter, one of the intruders ran up to B.K. and shot him three times.  The other intruder kicked in the bedroom door wherein R.K.'s parents were sleeping.  L.W. managed to slip out of the house unnoticed and called 9-1-1. The Livingston Police Department immediately dispatched officers to the scene.

The intruders asked the elderly parents where the money was kept. When they did not tell them immediately, R.K. told them.  The intruders found the cash and ran out of the house.  About a week after the murder, R.K. and C.K. identified the two intruders from a photo lineup.

The evidence was undisputed that Fisher was not one of the intruders and did not shoot B.K.  At trial, the State introduced evidence that Fisher initiated and was involved in the planning of the robbery and, on the night of the murder, drove the two intruders and two other individuals from Houston to the residence in Livingston for the purpose of

2

committing the robbery. The jury was charged under the law of parties. *See* Tex. Penal Code Ann. §§ 7.01(a), (b), 7.02(a), (b) (West 2011). Fisher was convicted of capital murder and sentenced to confinement for life without parole in the Texas Department of Criminal Justice. Fisher filed a motion for new trial arguing he was denied effective assistance of counsel and requested a hearing. The trial court denied Fisher's request for a hearing on his motion for new trial, and the motion was denied by operation of law.

## II.    MOTION FOR NEW TRIAL AND INEFFECTIVE ASSISTANCE OF COUNSEL

In issues one through three, Fisher argues (1) he was denied reasonably effective assistance of counsel at trial, (2) the trial court erred in denying Fisher's timely request for a hearing on his motion for new trial, and (3) the trial court erred in denying Fisher's motion for new trial based on his claim of ineffective assistance of counsel.

### A.  Right to hearing on motion for new trial

We review a trial court's denial of a hearing on a motion for new trial under an abuse of discretion standard. *King v. State*, 29 S.W.3d 556, 569 (Tex. Crim. App. 2000). To be entitled to a hearing on a motion for new trial, the defendant must present a motion for new trial "raising matters [that are] not determinable from the record, which could entitle him to relief[.]" *Id*. The motion must "be supported by [an] affidavit specifically showing the truth of the grounds" asserted in the motion. *Id*.; *Watson v. State*, 37 S.W.3d 559, 561 (Tex. App.—Beaumont 2001, no pet.) (citing *Reyes v. State*, 849 S.W.2d 812, 815-16 (Tex. Crim. App. 1993)). The purpose of these requirements is, among other

3

things, to prevent "'fishing expeditions'" seeking a general entitlement to a motion for new trial hearing. *See King*, 29 S.W.3d at 569; *Watson*, 37 S.W.3d at 561. Thus, affidavits that are "conclusory in nature and unsupported by facts do not provide the requisite notice of the basis for the relief claimed" and are insufficient to establish a defendant's right to a hearing on his motion for new trial. *Stokes v. State*, 298 S.W.3d 428, 431 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (citing *Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009)); *Watson*, 37 S.W.3d at 561 (citing *Jordan v. State*, 883 S.W.2d 664, 665 (Tex. Crim. App. 1994)).

Before a defendant is entitled to a hearing on his motion for new trial alleging ineffective assistance of counsel, he "must allege sufficient facts from which a trial court could reasonably conclude *both* that counsel failed to act as a reasonably competent attorney *and* that, but for counsel's failure, there is a reasonable likelihood that the outcome of his trial would have been different." *Smith*, 286 S.W.3d at 340-41. The reasonableness of counsel's choices generally involves facts that do not appear in the record; therefore, the record will generally be insufficient to show that counsel's representation was so deficient as to meet the first prong of the *Strickland* test. *Id*. at 341 (quoting *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002)). The same is true in the present case. Whether counsel's alleged omissions show a deficiency in performance that prejudiced the defense is not determinable from the record. Therefore, we must determine whether defendant's motion for new trial and supporting affidavit "allege facts that would reasonably show that his counsel's representation fell below the

4

standard of professional norms and that there is a reasonable probability that, but for his counsel's conduct, the result of the proceeding would have been different." *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

In his motion for new trial, Fisher alleged that trial counsel was ineffective in the following ways: (1) failing to adequately investigate the facts of the case to prepare for trial; (2) not requesting the assistance of an investigator to assist in the investigation; (3) not requesting the appointment of co-counsel in a capital case; (4) failing to obtain an order requiring the disclosure of expert witnesses before trial; (5) failing to file a motion for the appointment of an expert witness; (6) failing to adequately prepare for a punishment hearing; (7) and failing to file a written motion for change of venue. Fisher's only support for his motion for new trial was a one-page affidavit verified by Fisher. Fisher's affidavit made the following factual assertions in support of his claim of ineffective assistance of counsel:

> I am aware that the facts of the case had gotten a lot of publicity in Polk County before the trial. . . .

> . . . Between his appointment and the trial, [trial counsel] met with me 7 times. The total time we discussed the case was approximately 35 minutes. During that time we did not discuss the details of my case.

> Neither [trial counsel] or my previous attorneys discussed obtaining an investigator to help with my defense. [Trial counsel] did not discuss with me any attempt to obtain any expert witness to help with my defense. They did not discuss requesting appointment of a second attorney to assist with the case. [Trial counsel] did not discuss contacting my family. Members of my family have told me that they attempted to contact [trial counsel] and he never responded to those attempts. But he met them once before trial.

5

<u>Failure to adequately investigate the case</u>

In his motion for new trial Fisher argued in his first ground that his trial counsel provided ineffective assistance by failing to "adequately investigate the facts of the case to prepare for trial." Fisher asserted that trial counsel's "limited contact" with defendant prior to trial "was not justified by use of an investigator or co-counsel." In his second ground, Fisher argued that "[i]n a capital case trial counsel's duty to investigate includes seeking an investigator to assist counsel in conducting an independent investigation." Fisher contended that "[t]he record shows the State's case depended on multiple witnesses who should have been independently interviewed to prepare a defense[,]" and "no independent interviews occurred."

A claim for ineffective assistance based on trial counsel's general failure to investigate the facts of defendant's case is insufficient absent a showing of what the investigation would have revealed that reasonably could have changed the result of the case. *Stokes*, 298 S.W.3d at 432 (citing *Cooks v. State*, 240 S.W.3d 906, 912 (Tex. Crim. App. 2007)); *Jordan*, 883 S.W.2d at 665 (Texas Court of Criminal Appeals held the trial court did not abuse its discretion in denying a hearing on defendant's motion for new trial where defendant "failed to say why counsel's investigation was deficient, or what further investigation would have revealed."). "Likewise, a claim for ineffective assistance based on trial counsel's failure to interview a witness cannot succeed absent a showing of what the interview would have revealed that reasonably could have changed the result of the case." *Stokes*, 298 S.W.3d at 432. Fisher's bare assertions are insufficient to establish

6

facts entitling him to a hearing on his motion for new trial. Fisher's motion and supporting affidavit fail to show what further investigation counsel should have conducted, or what further investigation or discussion with Fisher would have yielded that would have been favorable to his defense. *See id.*; *see also Jordan*, 883 S.W.2d at 665. Additionally, Fisher's motion and affidavit do not provide the names of witnesses his trial counsel allegedly failed to interview or what further witness interviews would have revealed that reasonably could have changed the outcome of his case. *See Stokes*, 298 S.W.3d at 432. Because Fisher has failed to support these grounds with facts sufficient to support a reasonable likelihood that but for the alleged failures the result of the trial would have been different, these grounds provide no basis for relief. *See id.*; *see also Jordan*, 883 S.W.2d at 665.

<u>Failure to request the appointment of co-counsel</u>

In his third ground for ineffectiveness of counsel, Fisher argued that "defendant was represented by one attorney at trial" and the record contains "no request by defendant's trial counsel for appointment of co-counsel to represent defendant." Fisher does not cite to any case law in support of his contention that trial counsel was ineffective for failing to request the assistance of co-counsel to represent Fisher at trial.[1] But, again,

---

[1] Fisher cites to Guidelines and Standards for Texas Capital Counsel in support of his contention that trial counsel was ineffective for not requesting the appointment of co-counsel at trial and in support of several other grounds asserted in his motion for new trial. *See* State Bar of Texas, *Guidelines and Standards for Texas Capital Counsel*, 69 Tex. B.J. 966 (2006). However, each claim of ineffective assistance of counsel must be judged in view of "all the circumstances" of the particular case. *See Strickland v.*

7

Fisher does not allege what assistance co-counsel could have provided that reasonably could have changed the outcome of the case. Fisher's motion and affidavit fail to set forth facts which establish this ground as a basis for relief. *See King*, 29 S.W.3d at 569; *Jordan*, 883 S.W.2d at 665; *Stokes*, 298 S.W.3d at 432.

<u>Failure to obtain an order requiring disclosure of experts and failure to request appointment of an expert witness</u>

In his fourth ground, Fisher complains that trial counsel was ineffective for failing to file a motion for an order that required the State to disclose its expert witnesses at least twenty days before trial. *See* Tex. Code Crim. Proc. Ann. art. 39.14(b) (West Supp. 2012). On the motion of a party, the trial court may order the disclosure of expert witnesses "not later than the 20th day before the date the trial begins." *Id.* Fisher argues that because trial counsel failed to make a motion under article 39.14(b), the State was not prohibited from presenting evidence of undesignated experts at trial. In its designation of expert witnesses, the State designated eight expert witnesses. In State's witness list, it listed forty-seven witnesses. The State filed its designation of expert witnesses and witness list on May 18, 2011. The State filed supplemental witness lists on June 8 and June 10 notifying defendant that it might call four additional fact witnesses. Trial began on June 20, 2011.

---

*Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Therefore, the Court in *Strickland* recognized that standards such as the American Bar Association Standards for Criminal Justice are to be viewed as guides in determining what is reasonable. *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 522, 123 S. Ct. 2527, 2536, 156 L. Ed. 2d 471 (2003).

8

In his motion for new trial, Fisher argued that trial counsel's failure to make a motion for disclosure under article 39.14(b) "impaired his ability to properly cross-examine the State's experts and was deficient performance." Regardless of the fact that trial counsel failed to make a motion, all of the State's expert witnesses were timely designated. *See* Tex. Code Crim. Proc. Ann. art. 39.14(b). Fisher failed to allege in his motion for new trial or affidavit which of the State's expert witnesses he was unable to adequately cross-examine, why he was unable to adequately cross-examine such witnesses, what testimony may have been elicited on further cross-examination of such witnesses, or how the filing of an article 39.14(b) motion for timely designation of experts reasonably could have changed the outcome of his case.

In his fifth ground, Fisher argued that trial counsel was ineffective for failing to "file a motion for [the] appointment of an expert witness to assist the defense in cross-examination of the State's experts or as a testifying expert." Fisher argued that the State gave notice of its intent to present expert testimony, including "experts on the location of cellular telephones based on records of telephone service providers[,]" and that Fisher was "prejudiced by the absence of an expert to challenge the State's expert witness evidence." Contrary to Fisher's assertion, the State did not present expert testimony regarding the location of the cellular telephones. The witnesses who testified regarding the cell phone records and the location of the cell towers did not testify as expert witnesses.

9

John Rowe, with Verizon Wireless, testified regarding the Verizon Wireless cell phone records that were subpoenaed and admitted into evidence at trial. Michael Armellino, with T-Mobile, testified regarding the T-Mobile cell phone records that were subpoenaed and admitted into evidence at trial. Rowe and Armellino were not specifically identified by the State in its witness list as fact witnesses, though the State designated a "Custodian of Records" for both Verizon Wireless and T-Mobile. The testimony regarding the location of the cell towers that were accessed by the parties' cell phones on and around the night of the murder came in through Matt Parrish, a Livingston peace officer. Parrish testified that he obtained the longitude and latitude of the cell towers from the Verizon wireless cell phone records that were subpoenaed, and inputted the information into an internet mapping program to determine the location of the cell towers.[2] The T-Mobile cell phone records that were admitted into evidence listed the location of the cell towers being accessed by the cell phone at various times during calls.

Trial counsel did not object to the testimony of Rowe or Armellino on the basis that they were not properly designated or qualified as experts. Neither did trial counsel object to Parrish's testimony regarding the location of the cell towers. Trial counsel did not object on the basis that Parrish was improperly testifying as an expert, that he was not

---

[2] John Rowe's testimony established that the longitude and latitude coordinates of the cell towers, located on State's Ex. 92, provide the "general vicinity" of the cell tower in relation to the cell phone. Rowe testified that in a highly populated area "the pinging radius . . . is a half mile to two and a half miles. In an area that's not as populated, it would be two and a half miles to ten miles. So at the most [the cell tower being pinged] would be [within] ten miles" of the cell phone.

qualified to testify regarding the location of the cell towers, or that the State failed to lay the necessary predicate to qualify him as an expert witness. Further, Fisher did not argue in his motion for new trial that trial counsel was ineffective for failing to object to Parrish's testimony regarding the location of the cell towers.

Generally, to establish the right to the appointment of an expert witness, the defendant must "provide concrete reasons for requiring the appointment[.]" *Ex parte Jimenez*, 364 S.W.3d 866, 878 (Tex. Crim. App. 2012). To establish that a trial court erred in denying a motion for appointment of an expert witness, courts have required that the defendant submit a specific motion, name the requested expert, and explain why the expert is necessary in the particular case. *See id.*; *compare Rodriguez v. State*, 82 S.W.3d 1, 2-4 (Tex. App.—San Antonio 2001, pet. dism'd) (holding defendant was entitled to a hearing on her motion for new trial alleging that trial counsel was ineffective for failing to introduce credible expert testimony contradicting the State's cause of death theory where defendant attached a detailed affidavit to the motion for new trial naming the expert witness that should have been called and detailing his probable testimony favorable to the defense). Fisher did not allege in his motion for new trial or accompanying affidavit that a particular expert should have been called, or what testimony an expert witness may have provided or helped elicit from the State's witnesses that reasonably could have changed the outcome of the case. *Stokes*, 298 S.W.3d at 432; *Cooks*, 240 S.W.3d at 912. Fisher's motion and affidavit fail to set forth

11

facts which establish these grounds as a basis for relief. *See King*, 29 S.W.3d at 569; *Jordan*, 883 S.W.2d at 665; *Stokes*, 298 S.W.3d at 432.

Failure to Prepare for Punishment

In his sixth ground, Fisher argued that trial counsel was ineffective for failing to adequately prepare for the punishment phase of the trial. Specifically, Fisher argued that trial counsel failed to seek a mitigation specialist and failed to "interview any potential punishment witnesses." Fisher argued in his motion that "counsel did not interview any family members to investigate issues which could be used in the event of a punishment hearing[,]" which "placed the defense in the position of having to pursue an 'all or nothing' strategy at trial rather than having the option of presenting a defense at a punishment phase[.]" When a claim of ineffective assistance of counsel is based on the failure to call a witness, the defendant must show that the witness was available to testify, and that the defendant would have benefitted from his testimony. *Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004) (citing *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983)). Fisher did not identify any particular family members, or other witnesses, who were available to testify, state what testimony they may have provided, or how any such testimony would have benefited Fisher during punishment. And, though Fisher generally asserted in his motion as evidence of ineffective assistance of counsel that "[d]efense counsel was obligated to seek a jury charge on any lesser-included offense supported by the evidence[,]" Fisher did not assert in his motion or affidavit that there was any evidence to support an applicable lesser-included offense or point to any

12

particular defense he was prevented from pursuing as a result of counsel's alleged errors. Likewise, in his motion for new trial and accompanying affidavit, Fisher failed to set forth what particular assistance a mitigation specialist could have provided that may have benefited Fisher. Fisher's motion and affidavit fail to set forth facts to establish these grounds as a basis for relief. *See King*, 29 S.W.3d at 569; *Jordan*, 883 S.W.2d at 665; *Stokes*, 298 S.W.3d at 432.

<u>Failure to file a motion for change of venue</u>

In his seventh ground, Fisher argued that trial counsel was ineffective for failing to file a motion for change of venue. Specifically, Fisher argued that "[t]he prosecution of defendant and his codefendants had received substantial publicity in Polk County[,]" and that Fisher "was prejudiced by being forced to conduct *voir dire* on a panel which was familiar with many of the facts of the case." A change of venue may be granted on a defendant's motion when "there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial[.]" Tex. Code Crim. Proc. Ann. art. 31.03(a)(1) (West 2006). However, "[t]he mere fact of media attention and publicity do not . . . automatically establish prejudice or require a change of venue; jurors do not have to be totally ignorant of the facts and issues of a particular case." *Bell v. State*, 938 S.W.2d 35, 46 (Tex. Crim. App. 1996). To entitle a defendant to a change of venue "publicity about the case must be pervasive, prejudicial, and inflammatory." *Id.*

13

During voir dire, only three members of the venire panel indicated knowing of the case through media coverage or publicity. However, the three venire members were not placed on the jury. In his motion for new trial, Fisher alleged only that he was "aware that the facts of [his] case had gotten a lot of publicity in Polk County before the trial." No other facts are alleged in Fisher's motion for new trial or accompanying affidavit in support of his claim that counsel was ineffective for failing to seek a change of venue. Fisher's motion and affidavit fail to establish this ground as a basis for relief. *See King*, 29 S.W.3d at 569; *Jordan*, 883 S.W.2d at 665; *Stokes*, 298 S.W.3d at 432.

Fisher's affidavit is conclusory in nature and is insufficient to establish that he is entitled to a hearing on the grounds asserted in his motion for new trial. *See id.* Because Fisher has not established reasonable grounds to believe that he could prevail under his claim for ineffective assistance of counsel, we conclude the trial court did not abuse its discretion in failing to hold a hearing on his motion for new trial. *See King*, 29 S.W.3d at 569. On appeal, Fisher argues additional grounds in support of his claim that he received ineffective assistance at trial. However, we cannot conclude that the trial court erred in denying Fisher a hearing on grounds that were not presented in the motion before the trial court. *Keeter v. State*, 175 S.W.3d 756, 760 (Tex. Crim. App. 2005) (concluding "[t]he trial court cannot be said to have erred in denying a motion for new trial on a basis that was not presented to it."); *see also* Tex. R. App. P. 33.1. We overrule issue two.

14

## B. Ineffective assistance of counsel

Fisher also asserts separate issues on appeal in which he argues that he was denied reasonably effective assistance of counsel at trial generally and that the trial court erred in denying his motion for new trial based on his ineffective assistance of counsel claim. To prevail on his claim of ineffective assistance of counsel, Fisher must meet the standard set forth in *Strickland.* *See Strickland*, 466 U.S. at 687.[3] In evaluating the effectiveness of counsel under the first prong, we look to the "totality of the representation and the particular circumstances of each case[.]" *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. An allegation of ineffective assistance "'must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.'" *Thompson*, 9 S.W.3d at 814 (quoting *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996)). Therefore, the record on direct appeal will normally be insufficient to demonstrate by a preponderance of the evidence that an attorney's representation was so deficient and so lacking in tactical or strategic decision-making that an appellant will succeed in overcoming the presumption that representation was

---

[3] Appellant must first demonstrate that his trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *See Strickland*, 466 U.S. at 688; *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002); *Thompson*, 9 S.W.3d at 812. Second, Fisher must establish that his counsel's performance was so deficient that it prejudiced his defense. *Hernandez v. State*, 988 S.W.2d 770, 772 (Tex. Crim. App. 1999).

reasonably professional. *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). When the record is silent as to counsel's reasoning or strategy, we may not speculate to find trial counsel ineffective. *Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996, no pet.).

Though Fisher filed a motion for new trial and requested a hearing on the motion to substantiate his claim that counsel was ineffective, we held above that Fisher's motion lacked the evidentiary support required to entitle him to a hearing on his motion. Fisher's motion for new trial failed to show reasonable grounds to believe he could prevail under both prongs of *Strickland*. *See Smith*, 286 S.W.3d at 338, 340-41. Accordingly, there is no record that we can rely on to determine trial counsel's reasons for the challenged acts or omissions. Under these circumstances, Fisher has not met his burden to establish that he received ineffective assistance of counsel. We overrule issues one and three.

### III. CORROBORATION OF ACCOMPLICE TESTIMONY

In issue four Fisher argues that the non-accomplice witness evidence was insufficient to corroborate the accomplice witness testimony under Texas Code of Criminal Procedure article 38.14.

### A. "Article 38.14"

Texas Code of Criminal Procedure article 38.14 provides that a defendant cannot be convicted of an offense upon the testimony of an accomplice without other corroborating evidence tending to connect the defendant to the offense. Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005). When reviewing the sufficiency of non-accomplice

16

evidence under article 38.14, we determine whether the inculpatory evidence tends to connect the defendant to the commission of the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). "The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense." *Id.*; *see also Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009). For purposes of reviewing the sufficiency of the non-accomplice evidence, there is no required quantity of corroborating evidence. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). Moreover, when there are conflicting views of the evidence, we will defer to the fact-finder's resolution of the evidence. *Simmons*, 282 S.W.3d at 508.

## B. Accomplice Testimony

Two accomplices to the crime, Omega Jabar Manning and Anthony Poledore, testified at trial. At trial, Manning testified that sometime in the afternoon on August 21, 2009, Fisher called Manning's cell phone. According to Manning, Fisher asked him if he "[knew] anybody that would like to be down with a lick." Manning told the jury that "a lick" meant "a robbery." Manning testified that when he received Fisher's call he was with Jermaine Clifton. Manning stated that he and Clifton were both interested in participating in the robbery so they drove to Fisher's house. Manning testified that Fisher told him and Clifton that the victims kept $100,000 or more in their house. Manning testified that he, Fisher, and Clifton planned to recruit more guys to go inside the house.

17

Manning testified that Fisher contacted Jamuta Morris to see if he would be interested in participating in the robbery. Morris went to Fisher's house on the evening of the murder, but Manning testified that after Morris heard the details regarding the potential robbery, he said "it wasn't enough information" and left. Manning testified that Clifton used Manning's cell phone to contact Alderick Johnson to see if he was interested in participating in the robbery. Manning stated that when Clifton called Johnson, Anthony Poledore answered the phone. Thereafter, Fisher, Manning, and Clifton drove to the south side of Houston in Fisher's girlfriend's car to pick up Poledore and Johnson, who both wanted to participate in the robbery. At trial, Manning described Fisher's girlfriend's car and identified it from one of the State's photograph exhibits. Manning stated that they picked up Poledore and Johnson and drove to Livingston. Manning told the jury that during his dealings with Clifton, Johnson, and Poledore, Manning used the name "Mike."

Manning testified that Fisher was driving the car and that there were two black 9 millimeter handguns under Fisher's seat. Manning stated he did not know the guns were there until they got to Livingston. Manning told the jury that only Fisher knew the location of the victims' residence. When they arrived in Livingston, Fisher drove to the location and pointed out the house they were to rob. Manning stated that Clifton, Johnson, and Poledore were supposed to go in and get the money. Manning testified the plan was to "[g]o in and don't hurt nobody." Manning and Fisher were going to drive around during the robbery, and Poledore was going to call Manning's cell phone when

18

they were done. Manning stated that only he, Fisher, and Poledore were carrying cell phones. Manning testified that Fisher gave one 9 millimeter handgun to Clifton and the other to Poledore, then Clifton, Johnson, and Poledore got out and walked toward the back of the victims' residence and Manning and Fisher drove off.

Manning told the jury that about ten or fifteen minutes after Clifton, Johnson, and Poledore got out of the car, Poledore called Manning's cell phone and asked them to come pick him up where they had dropped him off. Manning explained that Poledore told them that they "tried to get in . . . , but they couldn't get in. So the three of them split up, and they ran [their] separate ways." Manning testified that Poledore appeared frightened and that he still had the gun that Fisher had given him. Manning stated that Poledore said he did not know where Clifton and Johnson were. Manning told the jury that he "wasn't feeling it no more" so Manning, Fisher, and Poledore headed back to Houston. According to Manning, they made it back to the Northeast side of Houston. Manning testified that when they got back to Houston, Fisher retrieved the handgun from Poledore, made sure the gun had not been fired, and then stashed it by a large trash dumpster.

Manning explained that shortly after they made it back to Houston, Poledore received a phone call from Johnson, who told them to come back to Livingston and pick him up at Burger King. Manning testified that some time thereafter, he got a phone call from Clifton also asking them to come back to Livingston and pick him up at Sonic. But when Manning, Fisher, and Poledore got back to Livingston, they observed Johnson

outside of the Burger King in handcuffs, surrounded by police officers, so they kept driving. Manning stated that when they arrived at Sonic, Clifton got out of a truck and got into Fisher's car. Clifton told them he had borrowed someone's phone. Manning testified that when they picked Clifton up he did not have the handgun Fisher had given him. Manning stated that Clifton told them that he shot a man during the robbery. According to Manning, Clifton said B.K. had a weapon and he shot him in self-defense, saying "it was either him or Johnson." Clifton told them that after he shot B.K., he "threw the gun to [Johnson] and started searching the house." Clifton was wearing a backpack and told them that he had the money. Manning explained that he, Fisher, Clifton, and Poledore then went back to Houston, went to Fisher's house, and divided up the money. Manning stated that they each got roughly $1,100-$1,200 dollars. Manning testified that Fisher said he had to go pick up his girlfriend and he and Poledore left together. Manning left Fisher's house with Clifton.

Poledore testified that on the day of the murder he was at Johnson's house. Poledore stated that Johnson received a phone call on his aunt's phone from Clifton. Poledore testified that Clifton and Johnson had a follow-up conversation on Poledore's cell phone. Poledore testified that when Clifton called Poledore's cell phone, he asked Poledore if he wanted to go to a party. According to Poledore, Clifton did not say where the party was, but Poledore agreed to go. Clifton told Poledore his Uncle "Mike" would take them to the party. Poledore stated that he then stepped outside while Johnson spoke

20

to Clifton. Poledore allegedly went home, got ready for the party and then went back to Johnson's house.

Poledore stated that Fisher, Manning, and Clifton picked up him and Johnson. Poledore testified that he only knew Johnson and Clifton and had never before seen Manning or Fisher. At trial, Poledore identified Fisher as the person who was driving the car. Poledore testified the guy in the front passenger seat introduced himself as Mike. Poledore later learned the passenger's real name was Omega Manning. Poledore told the jury that nobody told him where they were going. Poledore stated that after about 45 minutes to an hour Manning began talking about committing a robbery. Poledore explained that Manning wanted him, Clifton, and Johnson to "go get some money." Poledore testified that Manning pointed out the victims' house.

Poledore stated that he, Clifton, and Johnson got out of the car and went into the woods behind the victims' residence. Poledore testified that he did not want to participate in the robbery. Poledore testified that Clifton was carrying a backpack and took a gun out of the backpack. Poledore stated that he walked toward the house with Clifton and Johnson. Poledore stated that he stopped near the gate surrounding the property, but Clifton and Johnson kept going toward the front door. Poledore testified that Clifton tried to kick in the door but only made a loud noise. Poledore testified that Clifton and Johnson then ran one direction and he ran back into the woods where they had been dropped off. Poledore testified that he had Manning's number in his cell phone because Clifton had called Poledore's phone from Manning's cell phone earlier that day.

21

Poledore called Manning and told him Clifton and Johnson had left him. Fisher and Manning picked up Poledore where they had dropped him off. Poledore said they did not see Clifton or Johnson, so the three of them headed back towards Houston.

Poledore testified that before they made it back to Houston, he received a phone call from Johnson. Johnson told Poledore, "something bad just happened." They headed back to Livingston to pick up Johnson. Like Manning, Poledore testified that when they got back to Livingston, they saw Johnson in custody at the Burger King. However, Poledore testified that they then turned around and headed back to Houston a second time. Poledore explained that before they made it back to Houston, Manning received a phone call from Clifton asking them to pick him up at the Sonic in Livingston. Poledore testified that they went back to Livingston and picked up Clifton at Sonic. Poledore testified that Manning kept asking Clifton what happened, but Clifton "kept denying it." Poledore stated that after they picked up Clifton they went back to Houston, went to someone's house, and divided up the money. Poledore did not recall whose house they went to. Poledore stated that he left with Fisher in a green jeep Cherokee and they went to eat and then Fisher brought him home.

Poledore further testified that Manning called him the next day and told him that Clifton said he had shot a man during the robbery. Poledore stated that Manning told him not to "run [his] mouth." The day after the murder, Poledore went to Johnson's house and told Johnson's aunt what had happened. Poledore testified that after Manning found out that Poledore had told Johnson's aunt what had happened, Manning called Poledore's

22

cell phone multiple times.  Poledore said he hung up on Manning a few times.  Poledore testified that he did not have any other contact with Manning until they were incarcerated in the Polk County jail.

On cross-examination, Poledore testified that he did not see Fisher hand Clifton a gun, never saw Fisher with a gun, and the first time he saw a gun on the night of the murder was when Clifton pulled it out of his backpack in the woods. According to Poledore, he never heard Fisher planning the robbery.  Poledore testified that he heard Fisher talking about the victims' house, but that Manning was "the one kind of driving the show."

### C.  Non-accomplice evidence of Fisher's participation

At trial, Jamuta Morris testified that on August 21, 2009, Fisher called  him and asked him to come over.  Morris testified that when he arrived, Manning was at Fisher's house.  Morris testified there were two other people at the house, but Morris did not recognize them.  Morris stated that he heard someone say something about "a lick[,]" which he took to mean somebody "was going to do a robbery."  Morris did not recall who said the word "lick."  Morris testified that after hearing this he got up and left because he did not want to be involved.  On cross-examination, Morris testified that Fisher did not ask him to participate in a robbery.  He denied that anyone identified the name of the specific business or the town of Livingston.

The State introduced cell phone records of Fisher, Manning,  and Poledore pertaining to the day the murder was committed and the day after the murder was

23

committed. The cell phone records establish various communications between Fisher, Manning, and Poledore on the day of the murder and the day after the murder. In addition, the State presented testimony of Matt Parrish, a lieutenant with the Livingston Police Department. Parrish provided evidence regarding the location of the cell towers being accessed by the parties' cell phones, which provided evidence of the location of Fisher, Manning, and Poledore during the evening on the night of the murder. Parrish explained that the cell phone records provided information that allowed him to pinpoint which cell tower a cell phone was communicating with during a call; he described this as "pinging" the tower. Parrish testified that he inputted the longitude and latitude of cell towers, obtained from the Verizon wireless cell phone records that were already in evidence, into Google's mapping program to pinpoint the location of the towers the Verizon cell phones were pinging on around the time of the murder. The location of the cell towers accessed by Manning's T-Mobile cell phone was listed in the T-Mobile phone records.

The cell phone record evidence established a detailed history of various calls to and from the parties' cell phones at specific times and pinging off of the same cell towers to corroborate that the parties were travelling together and communicating in concert with each other on the night of the robbery and murder, in the vicinity of the crime and to and from north Houston, where the parties originated and planned their crime spree.

D. Sufficient Corroborating Evidence

The cell phone records, testimony regarding the location of the cell towers being accessed by the parties' cell phones on the night of the murder, and the testimony of Morris are sufficient to corroborate the testimony of Manning and Poledore regarding Fisher's involvement in the murder. The cell phone records, in conjunction with Parrish's testimony regarding the location of the cell towers being accessed, put Fisher, Manning and Poledore near the same locations around the same times on the night of the murder and put all three on a path that is consistent with travelling from Houston to Livingston and back. The cell phone evidence supports Manning and Poledore's testimony that Fisher was with them on the night of the murder, drove them from Houston to Livingston shortly before the murder occurred, and remained with them throughout the night. The cell phone evidence established that Fisher was roughly twenty minutes from Livingston, approximately twenty minutes after the crime occurred. Further, Morris's testimony corroborates Manning's testimony that Fisher called Morris to come to Fisher's house the evening of the murder in order to solicit Morris's participation in the crime. The cell phone records, Parrish's testimony, and Morris's testimony all tend to connect Fisher to the crime. *See Simmons*, 282 S.W.3d at 508. Taken together, and viewed in the light most favorable to the jury's verdict, this evidence is sufficient to corroborate the accomplice testimony. *See* Tex. Code Crim. Proc. Ann. art. 38.14. We overrule issue four.

25

## IV.    SUFFICIENCY OF THE EVIDENCE

In issue five, Fisher argues that the evidence is insufficient to support his conviction for capital murder.  We review a challenge to the legal sufficiency of the evidence in the light most favorable to the verdict to determine if a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see also Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010).  In reviewing the evidence, we give deference to the jury's responsibility to resolve any conflicts in the testimony, weigh the evidence, and to draw reasonable inference from facts.  *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

Fisher was convicted of capital murder.  The jury was instructed under the law of parties. *See* Tex. Penal Code Ann. §§ 7.01(a), (b), 7.02(a), (b).  Article 7.01(a) provides that "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id*. § 7.01(a). "Each party to an offense may be charged with commission of the offense." *Id*. § 7.01(b). A person is criminally responsible for the conduct of another if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]" *Id*. § 7.02(a)(2).  Additionally,

> [i]f, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the

26

offense was committed in the furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*Id.* § 7.02(b).

## A. Analysis

Fisher argues that under section 7.02(a)(2), a defendant who promotes or assists the commission of one offense, is not liable for a different offense committed by the other person. *See Gallardo v. State*, 281 S.W.3d 462, 470 (Tex. App.—San Antonio 2007, no pet.). Fisher argues that the evidence is insufficient to establish Fisher's liability as a party under section 7.02(a)(2) because there was no evidence that Fisher had the requisite intent "to promote, solicit or encourage the offense of capital murder." Additionally, Fisher argues that the evidence is insufficient to establish Fisher's liability as a conspirator under section 7.02(b) because there is no evidence that Fisher should have anticipated the murder as a result of the carrying out of the robbery. *See* Tex. Penal Code Ann. § 7.02(b).

In determining whether a defendant participated as a party, "the court may look to events occurring before, during and after the commission of the offense." *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1996) (op. on reh'g) (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). In addition to testifying that the robbery was Fisher's idea, that Fisher participated in planning the robbery, that Fisher helped solicit other people to participate in the commission of the robbery, that he drove Manning, Clifton, Johnson, and Poledore to Livingston, and that he pointed out the

27

victims' residence, Manning also testified that Fisher had two 9 millimeter handguns under the driver's seat of the car he was driving. Manning testified that Fisher gave a gun to Clifton and a gun to Poledore to use during the commission of the robbery. The evidence established that Clifton shot B.K., and R.K. and L.K. each testified that both of the intruders had guns. Fisher argues that Manning's testimony was contradicted by Poledore, who testified that he never saw Fisher hand Clifton a gun, that he never saw Fisher with a gun, and that the first time he saw a gun on the night of the murder was when Clifton pulled a gun out of his backpack in the woods. Fisher also relies on Manning's testimony that the plan was to "[g]o in and don't hurt nobody."

The weight to be given contradictory testimonial evidence is within the sole province of the jury because it turns on an evaluation of credibility and demeanor. *See Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992). The jury was free to believe Manning's testimony that Fisher gave Clifton and Poledore guns to use during the commission of the robbery. *See id.* Evidence that a defendant knew his co-conspirators might use guns in the course of committing a robbery has been held to be sufficient to demonstrate that a defendant should have anticipated that a murder could occur during the commission of the robbery. *Love v. State*, 199 S.W.3d 447, 453 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *see also Longoria v. State*, 154 S.W.3d 747, 756-57 n.7 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (concluding that evidence was sufficient to establish the defendant should have anticipated the murder of an officer during the robbery where the defendant provided his co-conspirator a handgun for use

28

during robbery); *Flores v. State*, 681 S.W.2d 94, 96 (Tex. App.—Houston [14th Dist.] 1984) (holding murder should have been anticipated as a possible result of burglary, where appellant knew accomplice had a gun), *aff'd*, 690 S.W.2d 281 (Tex. Crim. App. 1985). Viewing the evidence in the light most favorable to the jury's verdict, we conclude that the evidence is sufficient to support Fisher's conviction under section 7.02(b) of the Penal Code. *See* Tex. Penal Code Ann. § 7.02(b); *see also Love*, 199 S.W.3d at 453; *Longoria*, 154 S.W.3d at 757 n.7; *Flores*, 681 S.W.2d at 96. We overrule issue five.

Having overruled all of Fisher's appellate issues, we affirm the judgment of the trial court.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on August 20, 2012
Opinion Delivered November 7, 2012
Do not publish

Before McKeithen, C.J., Kreger and Horton, JJ.